**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STONEHENGE ENGINEERING
CORPORATION; NATIONAL STONEHENGE
CORPORATION,
Plaintiffs-Appellees,

No. 98-2673

v.

EMPLOYERS INSURANCE OF WAUSAU,
Defendant-Appellant.

STONEHENGE ENGINEERING
CORPORATION; NATIONAL STONEHENGE
CORPORATION,
Plaintiffs-Appellants,

No. 98-2680

v.

EMPLOYERS INSURANCE OF WAUSAU,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-97-1569-3-19)

Argued: September 22, 1999

Decided: January 13, 2000

Before TRAXLER, Circuit Judge, HAMILTON, Senior Circuit
Judge, and Joseph R. GOODWIN, United States District Judge for
the Southern District of West Virginia, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Goodwin joined. Judge Traxler wrote a separate opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Charles Elford Carpenter, Jr., RICHARDSON, PLOWDEN, CARPENTER & ROBINSON, P.A., Columbia, South Carolina, for Appellant. James Livingston Bruner, BRUNER, POWELL & ROBBINS, L.L.C., Columbia, South Carolina, for Appellees. **ON BRIEF:** Francis M. Mack, S. Elizabeth Brosnan, RICHARDSON, PLOWDEN, CARPENTER & ROBINSON, P.A., Columbia, South Carolina, for Appellant.

_____

**OPINION**

HAMILTON, Senior Circuit Judge:

Two corporately related general contractors, Stonehenge Engineering Corporation and National Stonehenge Corporation (collectively Stonehenge) brought this diversity action against Employers Insurance of Wausau (Wausau) seeking indemnification, under three successive standard commercial general liability policies issued by Wausau to Stonehenge, for an amount Stonehenge agreed to pay to settle a lawsuit against it alleging defective construction of condominium units. In its complaint, Stonehenge also alleged two bad faith claims against Wausau, one asserting bad faith refusal to indemnify and defend, the other alleging bad faith refusal to settle.

The district court granted Stonehenge's motion for summary judgment on its breach of contract claim, i.e., its indemnification claim, and granted Wausau's motion for summary judgment on Stonehenge's two bad faith claims. On appeal, Wausau challenges the district court's grant of Stonehenge's motion for summary judgment on the breach of contract claim. Stonehenge cross appeals the district court's grant of Wausau's motion for summary judgment on the two

2

bad faith claims. Stonehenge also assigns error to the district court's refusal to award it interest for the period of time between the settlement of the underlying lawsuit and the date of the entry of judgment on its breach of contract claim.

We affirm the district court in all respects, except we vacate the damage portion of the judgment in favor of Stonehenge and remand for entry of judgment in a specified lesser amount.

I.

During the early to mid-1980s, Stonehenge constructed Phase III of a condominium project known as "Yacht Cove" in Lexington County, South Carolina on the shores of Lake Murray. Phase III consisted of nineteen buildings, totaling 130 residential units. Thirty-two of the units were known as "villa" units, while the remaining ninety-eight units were known as "townhouse" units. Stonehenge completed construction of Phase III in March 1987.

In approximately 1989, the owners of residential units constructed in Phase III began experiencing problems with Phase III buildings. For example, the owners noticed buckled siding, cracks in foundations, and sagging balconies. As a result, the Yacht Cove Owners Association (the Owners Association) hired G. Allen Moore (Moore), a private building inspector, to inspect the buildings at issue and prepare a report. On March 19, 1990, Moore submitted his report (the Moore Report) to the Owners Association. The Moore Report identified defects in the balconies, roofs, foundations, basement walls, porches, decks, handrails, pickets, stairs, siding, and flashing of Phase III buildings. In the fall of 1996, Moore also identified defects in the subflooring of Phase III buildings.

The Owners Association subsequently sent a copy of the Moore Report to the developer of Yacht Cove, Equitable Real Estate Investment Management, Inc., which in turn sent a copy to Stonehenge on September 25, 1990. Stonehenge investigated the alleged defects identified in the Moore Report and responded in writing to the report on November 12, 1990. In its response, Stonehenge completely denied responsibility for the alleged defects on the basis that it constructed Phase III in accordance with the building code in effect for

Lexington County at the time of construction, and on the basis that the damage identified in the Moore Report resulted from lack of proper owner maintenance and/or owner alteration of certain portions of Phase III buildings. Stonehenge admitted the existence of a "riser" code violation on the front of a particular Phase III building, but attributed its existence to settlement of the right corner of the adjacent sidewalk.

On April 16, 1992, the Owners Association notified Stonehenge by letter that if a representative of Stonehenge did not contact its attorney within ten days, it would assume that Stonehenge did not intend to voluntarily address the defects identified in the Moore Report, thus requiring it to take legal action against Stonehenge. The record does not disclose whether Stonehenge responded to this letter, but shortly after receiving it, Stonehenge notified Maryland Casualty Insurance Company (Maryland Casualty) of the Owners Association's claims. Maryland Casualty insured Stonehenge under a commercial general liability policy from July 1, 1986 to November 1, 1987. Of relevance to this appeal, several other general liability insurance carriers successively insured Stonehenge under commercial general liability policies from November 1, 1987 until November 1, 1995. Aetna Casualty and Surety Company (Aetna) insured Stonehenge from November 1, 1987 to November 1, 1991. Home Insurance Company (Home) insured Stonehenge from November 1, 1991 to November 1, 1992. Finally, Wausau insured Stonehenge under three annual standard commercial general liability policies for the time period November 1, 1992 to November 1, 1995 (the Three Wausau Policies).**1**

_____

**1** Each of the Three Wausau Policies provides that Wausau "will pay those sums that [Stonehenge] becomes legally obligated to pay as damages because of . . . `property damage' to which this insurance applies." (J.A. 365, 422, 490). Each states that it applies to property damage only if the property damage is caused by an "occurrence" that takes place in the coverage territory and occurs during the policy period.

The term "occurrence" is defined by the Three Wausau Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (J.A. 375, 432, 501). Each defines the term "property damage" as "Physical Injury to tangible property, including all resulting loss of use of that property." (J.A. 376, 433, 502). Finally, each provides that Wausau would have the right and duty to defend any suit against Stonehenge seeking damages for which indemnification coverage exists, and, in its discretion, the right to investigate any occurrence and settle any claim or suit that may result.

After receiving notice of the Owners Association's claims against Stonehenge, Maryland Casualty investigated Phase III buildings under a reservation of rights and requested additional information from Stonehenge. Maryland Casualty conducted an on-site investigation that revealed, <u>inter alia</u>, some problems with the lightweight concrete floors in two villa units, primarily in the kitchen area underneath the vinyl flooring.**2** On September 29, 1992, Stonehenge submitted an extensive written response to a request by Maryland Casualty for more information. In its response, Stonehenge stated that its first notice of any problems with Phase III buildings was its receipt of the Moore Report in September 1990.

Stonehenge notified Aetna of the Owners Association's claims on October 21, 1992. Like Maryland Casualty, Aetna investigated the claims under a reservation of rights.

On April 6, 1993, the Owners Association filed suit against Stonehenge in the Court of Common Pleas for Lexington County, South Carolina. The suit alleged that in constructing Phase III buildings, Stonehenge was negligent and breached its implied warranty to perform work in a careful, diligent, and workmanlike manner. The Owners Association sought 1.27 million dollars in damages, with the bulk of this figure constituting the amount the Owners Association believed would be necessary to re-side the exterior of every building in Phase III and replace the light-weight concrete floors in every villa unit.

By March 1996, the Owners Association could ill afford to pay the ongoing fees generated by its attorneys, who had taken the case on an hourly-rate basis, rather than on a contingency-fee basis. As a result, the Owners Association offered to settle its suit against Stonehenge

_____

**2** The lightweight concrete floor installed in every villa unit was part of a flooring system that included floor trusses spaced twenty-four inches on center with five-eighth inch plywood spanning the trusses. A one and one-half inch layer of lightweight concrete was then poured on top of the plywood and then padding and carpet, vinyl, or wood parquet flooring was placed on top depending upon the type of room. The lightweight concrete floor had no function other than acting as a sound barrier.

5

for $400,000 with a "drop dead" date to accept the offer by April 11, 1996. Stonehenge refused the settlement offer.

Wausau did not receive notice of the Owners Association's suit against Stonehenge or its pre-suit claims until late March 1996, just after Stonehenge received the settlement offer. [3] By copy of a letter to Aetna dated July 12, 1996, the claims adjuster at Wausau handling Stonehenge's claim, Charles Gause, informed Stonehenge that Wausau was not in a position to contribute to any settlement without the following: "Evidence of `Property Damage' caused by an `Occurrence' which took place during our policy period or case law in South Carolina which in some way requires us to contribute to a settlement."[4] (J.A. 318).

A year later, with a trial set for March 17, 1997 rapidly approaching, Wausau was asked again to participate in settlement discussions, but Wausau refused for the same reason given before. Just prior to trial and after extensive trial preparation, the Owners Association was willing to accept $625,000 to settle its $1.27 million suit. Maryland Casualty agreed to contribute $100,000, Aetna agreed to contribute $300,000, and Home agreed to contribute $75,000. These figures represented the amount each carrier believed constituted its pro-rata share of the proposed settlement figure.

On March 17, 1997, Stonehenge entered into a settlement agreement (the Settlement Agreement) with the Owners Association. In accordance with the Settlement Agreement, each Stonehenge entity confessed judgment for $750,000 in favor of the Owners Association on April 17, 1997. In accordance with the amounts each carrier agreed to contribute toward the $625,000 settlement figure, Maryland Casualty made a $100,000 cash payment, Aetna made a $300,000 cash payment, and Home made a $75,000 cash payment. This left a

_____

**3** Although Stonehenge makes some attempt in its brief to assert that it notified Wausau earlier, the record contains no evidence to support its assertion.
**4** Notably, Wausau does not appear to dispute that the Phase III buildings suffered damage during the policy periods of the Three Wausau Policies as a result of Stonehenge's faulty construction of those buildings in the early to mid-1980s.

6

balance of $150,000 still owed to the Owners Association pursuant to the Settlement Agreement. Although Wausau had sufficient notice and opportunity to participate in the discussions that led to the Settlement Agreement, Wausau refused to participate.

The Settlement Agreement also provided that the Owners Association could not execute upon the confession of judgment against National Stonehenge Corporation. Furthermore, Stonehenge Engineering Corporation would be liable for any balance due on the confession of judgment it signed after it had exhausted or fully pursued its rights of indemnification against Wausau.

The state trial judge reviewed the Settlement Agreement and found that under the facts of the case, the Settlement Agreement was a "fair and equitable resolution of the matter." (J.A. 29). Thereafter, the state trial judge approved the Settlement Agreement and adopted it as his order.

On May 28, 1997, Stonehenge filed the present diversity action against Wausau, alleging three counts in connection with the Three Wausau Policies. Count I alleged breach of contract, Count II alleged bad faith refusal to indemnify and defend, and Count III alleged bad faith refusal to settle. Stonehenge sought $250,000 in damages, prejudgment interest, punitive damages, attorney's fees, and costs. Wausau answered, denying the complaint's material allegations.

The parties filed cross motions for summary judgment on the breach of contract claim. On February 20, 1998, the district court granted Stonehenge's motion for summary judgment on the breach of contract claim and denied Wausau's cross motion for summary judgment on the same claim. Wausau subsequently filed a motion for summary judgment on Stonehenge's two remaining claims (bad faith refusal to indemnify and defend and bad faith refusal to settle), which the district court granted on June 5, 1998.

The parties stipulated that the amount of Wausau's allocated contribution towards the settlement Stonehenge reached with the Owners Association was a matter for the district court to decide. After the parties submitted memoranda on the issue, the district court allocated damages against Wausau in the amount of $190,500, representing

25.4% of $750,000. In making its determination as to this amount, the district court found that the trigger period of coverage under the Three Wausau Policies ended on March 17, 1997, the date Stonehenge and the Owners Association executed the Settlement Agreement. Further, the district court stated:

> Yacht Cove alleged more than $1.3 million in damages resulting from construction defects in the underlying suit, but instead agreed to settle its claim for $750,000, thereby capping all future damages arising out of the alleged construction defects. The court finds that this figure, although not based on actual damages, was not entered into collusively and fraudulently and is a proper amount upon which to calculate the allocation in the instant case. This settlement amount necessarily took into account the uncertainty of litigation and the expense of prosecuting the case to a verdict. Moreover, it roughly approximated earlier settlement negotiations. In addition, the trial judge in the underlying case reviewed the settlement agreement and specifically found it to be a fair and equitable resolution. Finally, the court's use of the negotiated agreement in the underlying suit promotes the public policy of encouraging settlement.

(J.A. 191) (footnote omitted). The district court entered final judgment in favor of Stonehenge on its breach of contract claim on August 14, 1998.

Stonehenge filed a motion to alter or amend judgment and Wausau filed a motion for reconsideration. The district court denied both motions. Both parties noted timely appeals. Wausau appeals the district court's entry of judgment in favor of Stonehenge on the breach of contract claim. Stonehenge appeals the district court's entry of judgment in favor of Wausau on the two bad faith claims. Furthermore, Stonehenge contends the district court erred in refusing to award it interest at the South Carolina statutory rate for judgments of 14% per annum, see S.C. Code Ann. § 34-31-20 (Law. Co-op. 1987), from the date of the confessions of judgment (April 21, 1997) until the date of the entry of judgment in its favor on its breach of contract claim (August 14, 1998).

II.

Wausau argued below and continues to argue on appeal that it is not obligated under the terms of the Three Wausau Policies to indemnify Stonehenge for any portion of the confessions of judgment because the record contains uncontradicted evidence showing that Stonehenge had notice of the Owners Association's pre-suit claims prior to the respective effective dates of the Three Wausau Policies and had notice of the resulting lawsuit prior to the effective dates of the second and third Wausau Policies. In support of its argument, Wausau relies upon the known loss doctrine, which is a common law affirmative defense to an insured's claim of policy coverage. See, e.g., United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 690-91 (1st Cir. 1995) (applying Massachusetts law and recognizing that a majority of courts treat the known loss doctrine as an affirmative defense to a claim of coverage); 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 102:8 (3d ed. 1996 & Supp. 1998). On this basis, Wausau seeks reversal of the district court's entry of judgment in favor of Stonehenge on Stonehenge's breach of contract claim.

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We review de novo the district court's grant of Stonehenge's motion for summary judgment in the face of Wausau's assertion of the known loss doctrine as an affirmative defense, viewing the evidence in the light most favorable to Wausau. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991).

As most often stated, the known loss doctrine in common law insurance jurisprudence excludes coverage of a loss to the insured of which the insured had actual knowledge prior to the policy's effective date or knew was substantially certain to occur. See, e.g., United States Liab. Ins. Co., 70 F.3d at 690-91 (applying Massachusetts law); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1210 (Ill. 1992) (applying Illinois law); 7 Couch on Insurance § 102:8 (recognizing as general rule). The known loss doctrine seeks to prevent the concept of an insurable risk from becoming a mere fiction when the insured knows there is a substantial probability that it has

9

suffered or will suffer a loss covered by the policy.**5** <u>See United States Liab. Ins. Co.</u>, 70 F.3d at 691; 7 <u>Couch on Insurance</u> § 102:8-9. Because the known loss doctrine is an affirmative defense, the burden of proving the doctrine's applicability rests with the party asserting it. <u>See O'Neal v. Carolina Farm Supply of Johnston, Inc.</u> , 309 S.E.2d 776, 779 (S.C. Ct. App. 1983) (party asserting affirmative defense bears the burden of proving it).

Both parties agree that the substantive law of South Carolina applies to resolve whether the district court erred in granting Stonehenge's motion for summary judgment on its breach of contract claim in the face of Wausau's assertion of the known loss doctrine as an affirmative defense. However, no South Carolina case exists applying or addressing the known loss doctrine. Nevertheless, Stonehenge does not deny that the doctrine exists as part of South Carolina's common law. It does contend, however, that Wausau failed to carry its burden of forecasting sufficient evidence, when viewed in the light most favorable to Wausau, to prove the defense.

Because the parties are in agreement that South Carolina's substantive law controls our resolution of this issue, we assume the same <u>arguendo</u>. Furthermore, because no South Carolina case exists applying or addressing the known loss doctrine, we will assume, as the parties appear to, that the Supreme Court of South Carolina would recognize the existence of the known loss doctrine as part of South Carolina's common law in its most commonly articulated form. <u>Cf. Hoechst Diafoil Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 418 (4th Cir. 1999) (holding that in predicting how a state's highest court

_____

**5** As the Third Circuit recognized in <u>Pittston Co. Ultramar American Limited v. Allianz Insurance Co.</u>, 124 F.3d 508, 516 n.9 (3d Cir. 1997), the known loss doctrine has a few variants, often referred to as the doctrines of "known risk" or "loss in progress." In addition, it appears that those terms are often conflated or used interchangeably. <u>See, e.g.</u>, <u>City of Johnstown v. Bankers Standard Ins. Co.</u>, 877 F.2d 1146, 1152-53 (2d Cir. 1989) (discussing doctrine of "known risk"); <u>Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.</u> , 997 F.2d 172, 174-75 (6th Cir. 1993) (describing "loss in progress" as variant of the "known loss" doctrine). We believe that "known loss" best describes the doctrine at issue here, and we will use that term throughout our discussion.

would decide an undecided matter of state law, a federal court may seek guidance from all available resources, including other jurisdictions).

Here, the insurable risk of loss at issue is the risk of Stonehenge's liability to the Owners Association for property injury. Therefore, the question before us is whether the evidence, when viewed in the light most favorable to Wausau, establishes that Stonehenge (1) actually knew that it was legally liable for the property damage claimed by the Owners Association at the time one or more of the Three Wausau Policies took effect or (2) knew that such liability was substantially certain to occur. See United States Liab. Ins. Co. , 70 F.3d at 689-91.

We answer this question in the negative. When the record is viewed in the light most favorable to Wausau, the evidence establishes that Stonehenge's receipt of both the Moore Report in September 1990 and the Owners Association's April 16, 1992 letter threatening legal action against Stonehenge served to put Stonehenge on notice that the Owners Association intended to hold it legally liable for the alleged defects in the Phase III buildings. Nevertheless, such notice does not trigger applicability of the known loss doctrine, as it does not establish that Stonehenge actually knew that it was legally liable for the property damage claimed by the Owners Association at the time one or more of the Three Wausau Policies took effect or knew that such liability was substantially certain to occur.

Moreover, the fact that the Owners Association filed suit against Stonehenge in April 1993, prior to the effective dates of the second and third Wausau Policies, does not trigger application of the known loss doctrine. In order to prevail at trial upon its claim of negligent construction against Stonehenge, the Owners Association would have to show the following by a preponderance of the evidence: (1) a duty of care owed by Stonehenge to the Owners Association; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach. See South Carolina Ins. Co. v. James C. Greene & Co., 348 S.E.2d 617, 620 (S.C. Ct. App. 1986). In order to prevail at trial upon its claim of breach of implied warranty to perform work in a careful, diligent, and workmanlike manner, the Owners Association would have to prove that Stonehenge did not construct Phase III buildings in a careful, diligent, and workmanlike

11

manner. See Kennedy v. Columbia Lumber & Mfg. Co., 384 S.E.2d 730, 736 (S.C. 1989).

In Stonehenge's response to the Moore Report, Stonehenge attributed the defects identified to inadequate owner maintenance and third-party alteration of the original structures. With the exception of the deterioration of the lightweight concrete floors in the villa units, inadequate owner maintenance and third-party alteration of the original structures constituted sufficiently viable defenses prior to the effective dates of the Three Wausau Policies so as to prevent the conclusion that Stonehenge had knowledge that entry of a judgment against it was substantially certain to occur.

As for the lightweight concrete floors, in 1992, four of the thirty-two lightweight concrete floors constructed in late 1985 and early 1986 in the villa units had failed and were replaced. Specifically, the lightweight concrete broke up in the high traffic areas and slightly broke up in the other areas. The record establishes that Stonehenge had knowledge of the problems with regard to the lightweight concrete floors in these four villa units by late August or early September 1992 and further knew of the obvious potential for problems with the remaining twenty-eight villa units.

Such knowledge on the part of Stonehenge, however, does not equate to knowledge prior to the effective dates of the Three Wausau Policies that imposition of liability upon it for construction of the lightweight concrete floors in all of the villa units was substantially certain to occur. First, the Owners Association's expert witness did not even inspect the buildings of Phase III until the spring of 1995, which is after the effective dates of the Three Wausau Policies. Second, prior to the depositions of the expert witnesses in this case, which did not begin until mid-1995, the possibility that the lightweight concrete itself was a defective product was not ruled out as the sole cause of the cracking. If the lightweight concrete itself was a defective product, and thus caused the cracking, the Owners Association's negligence and breach of implied warranty claims could not prevail.

In sum, Wausau failed to carry its burden of proffering sufficient

12

evidence to establish the affirmative defense of the known loss doctrine against Stonehenge's breach of contract claim. [6]

III.

Wausau alternatively seeks reversal of the district court's entry of judgment in favor of Stonehenge on Stonehenge's breach of contract claim on the basis that an "occurrence," as that term is defined in standard commercial general liability policies such as the Three Wausau Policies at issue here, did not take place during the time any of the Three Wausau Policies were in force. Therefore, Wausau contends, coverage was never triggered under any of the Three Wausau Policies. Wausau insists that according to South Carolina law, the period of coverage under standard commercial general liability policies for the progressive construction damage at issue here ended at the latest in 1990 upon discovery of the damage to Phase III buildings. In support of its argument, Wausau relies upon certain language in this court's decision in Spartan Petroleum, Co. v. Federated Mutual Insurance Co., 162 F.3d 805 (4th Cir. 1998), addressing the South Carolina Supreme Court's decision in Joe Harden Builders, Inc. v. Aetna Casualty & Surety Co., 486 S.E.2d 89, 91 (S.C. 1997), which examined the operation of the term "occurrence" in a standard commercial general liability policy when the damage at issue is progressive property damage.

We find Wausau's alternative argument without merit. In Joe Harden, the South Carolina Supreme Court held that in the case of progressive property damage, such as property damage caused by faulty construction, the time of the "occurrence" for purposes of a standard commercial general liability policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged, i.e., injury-in-fact, and continuously thereafter to allow coverage under all policies in effect from the time of injury-

_____

[6] In addition to opposing Wausau's assertion of the known loss doctrine on the merits, Stonehenge alternatively argues that Wausau waived its opportunity to assert the affirmative defense before the district court by failing to assert the defense in its answer. Because we have disposed of Wausau's assertion of the known loss doctrine on the merits, we need not and do not address Stonehenge's alternative waiver argument.

13

in-fact through the time of the progressive damage. See Joe Harden, 486 S.E.2d at 91; see also Spartan Petroleum, 162 F.3d at 808 (stating that according to Joe Harden, liability under a standard commercial general liability policy is triggered when injury to the property itself occurs and "can continue over several policy periods, thus triggering more than one policy"). According to the South Carolina Supreme Court, "this theory of coverage will allow the allocation of risk among insurers when more than one insurance policy is in effect during the progressive damage." Joe Harden , 486 S.E.2d at 91. Joe Harden does not contain language even suggesting that the trigger period for coverage under a commercial general liability policy ends upon discovery of the property damage rather than continuing as long as the progressive damage continues to occur.

For the proposition that the trigger period for coverage under a standard commercial general liability policy ends in a progressive property damage case upon the initial discovery of property damage, Wausau relies upon certain language in Spartan Petroleum. In that case, the insured, Spartan Petroleum Company, Inc. (Spartan Petroleum), leased a piece of real property and maintained an underground gasoline storage system on it. See Spartan Petroleum, 162 F.3d at 806. The storage system leaked gasoline onto a certain parcel of adjacent property. The property owners of that parcel sued Spartan Petroleum for damages to their property caused by the gasoline contamination. See id. at 807. The suit settled, and Spartan Petroleum sought indemnification from Federated Mutual Insurance Company (Federated) pursuant to a standard commercial general liability policy. See id. Federated refused to settle. See id.

Spartan Petroleum then sued Federated in federal court for breach of duty to defend and indemnify. Spartan Petroleum won summary judgment in its favor with respect to both duties. See id. We affirmed the judgment of the district court as to Federated's duty to defend, but reversed as to Federated's duty to indemnify. See id. at 813. We remanded the case to the district court to determine when the contamination reached the adjoining property, and thus, whether there was an "occurrence" during the policy period. See id. at 811, 813.

To aid the district court on remand, we set out the proper method of allocating damages in the event the policy applied: Federated's lia-

14

bility "would be a proportion of the . . . settlement equal to the period the Federated policy or policies covered, divided by the total period of damages." Id. at 813. We further explained that the total period of damages "runs from the injury-in-fact--the time the contamination migrated onto the [adjacent] property--`until the damage [was] complete.'" Id. (quoting Joe Harden, 486 S.E.2d at 91). We then stated that "[w]e take the time the damage was `complete' to be the time it was discovered, which in this case is 1990." Id.

Wausau seizes upon this last quoted statement in Spartan Petroleum in divining that we have interpreted Joe Harden to provide that the trigger period of coverage in a progressive property damage case always ends when injury-in-fact is discovered. Thus, Wausau contends, the trigger period of coverage in the present case ended at the latest in 1990 "when the damage at Yacht Cove was discovered, not the date of settlement." (Wausau Br. at 21).

Wausau completely misconstrues our decision in Spartan Petroleum with respect to when termination of the trigger period of coverage in a South Carolina progressive property damage case occurs. After reading the entire decision in Spartan Petroleum, one is left with the clear understanding that our reference to "the time [when the damage] was discovered" was case specific. Spartan Petroleum, 162 F.3d at 813. Apparently, immediately after the contamination was discovered upon the adjacent property, the contamination was cleaned up, thus stopping any further damage. See id. at 807. Thus, the discovery of the contamination coincided with the completion of the damage.

To read Spartan Petroleum as laying down a blanket rule that discovery of damage ends the trigger period of coverage in a progressive property case would completely undercut the thrust of the South Carolina Supreme Court's opinion in Joe Harden. Obviously, under some circumstances, and especially in a defective construction case, deterioration of or damage to the property at issue can continue to occur despite discovery of existing defects or damage. Critically, in the present case, Wausau does not appear to dispute that Phase III buildings continued to deteriorate during the effective dates of the Three Wausau Policies as a result of Stonehenge's defective construction practices. Therefore, under South Carolina case law, an "occurrence"

15

has taken place for purposes of the Three Wausau Policies. We, therefore, affirm the liability portion of the district court's entry of judgment upon Stonehenge's motion for summary judgment on its breach of contract claim.

IV.

Wausau contends that if we uphold its liability on Stonehenge's breach of contract claim, we must vacate the district court's judgment and remand for recalculation of the amount it owes Stonehenge in indemnification. In this regard, Wausau first argues that the district court's use of the $750,000 confessions of judgment figure in calculating its pro-rata share, instead of using the $475,000 figure actually paid by the other carriers, violated our holding in Hitt v. Cox, 737 F.2d 421 (4th Cir. 1984), and therefore, amounted to an abuse of the district court's discretion. Alternatively, Wausau argues that sufficient evidence exists to establish that the $750,000 figure is the product of fraud and collusion, and therefore, cannot serve as the basis for establishing the amount of indemnification it owes Stonehenge.

Although we find no evidence in the record suggestive of fraud or collusion, we agree with Wausau that the district court's use of the $750,000 confessions of judgment figure instead of the $475,000 figure actually paid by the other carriers conflicts with our holding in Hitt. In Hitt, we held that a conditional settlement whereby the insured party agreed to pay the injured party an additional $150,000 in damages if the liability carrier was held obligated to indemnify it was unreasonable, and therefore, invalid because "the negotiating parties no longer ha[d] adverse interests and their settlement is presumptively unreasonable." Id. at 426. The rationale for our holding in Hitt is that an insured should not be allowed to seek indemnity from a liability carrier for "amounts that the insured does not expect to pay out of its own resources." Id. (emphasis added). To allow full recovery against the liability carrier "would set a precedent allowing any insured left to defend himself not only to settle at a reasonable amount, but to give away an additional amount up to the liability limit of the policy conditional on a successful indemnity suit against the insurance company." Id.

In the present case, all of the evidence points to the conclusion that Stonehenge Engineering Corporation and National Stonehenge Cor-

16

poration never intended to pay the Owners Association any excess of their respective confessions of judgment not covered by Wausau. With respect to National Stonehenge, under express terms of the Settlement Agreement, completely overlooked by the dissent, the Owners Association agreed not to file or execute upon the confession of judgment signed by National Stonehenge Corporation. Clearly, in this circumstance, National Stonehenge Corporation did not expect to pay any amount of the balance due on its confession of judgment out of its own resources in direct contravention of our holding in Hitt. Therefore, under Hitt, the district court abused its discretion by using the $750,000 confession of judgment figure with respect to National Stonehenge Corporation. We reach this conclusion despite the district court's finding that the Settlement Agreement between the Owners Association and Stonehenge was not the product of fraud or collusion. Hitt does not appear to require the presence of fraud or collusion between the insured and the injured party in order to prevent full indemnification on a conditional settlement when the insured never expected to pay the conditional amount out of its own resources.

Unlike National Stonehenge Corporation, the Settlement Agreement did provide that the Owners Association could execute on the confession of judgment signed by Stonehenge Engineering Corporation if Stonehenge Engineering was not successful in obtaining indemnification from Wausau. In support of its argument that Stonehenge Engineering Corporation knew that it would never pay any portion of the balance of its confessed judgment out of its own resources when it entered into the Settlement Agreement, Wausau directs this court to a letter dated April 3, 1996, approximately a year before the execution of the Settlement Agreement. The letter, from the corporate attorney for Stonehenge Engineering Corporation to a Wausau adjuster, states:

> [P]lease be advised that Stonehenge Engineering Corporation is not financially able to contribute to a settlement of this case. This Corporation has been a shell corporation for over five years for reasons that are totally unrelated to this or any other litigation. The [Owners Association] seem[s] to have finally gotten the message that the idea of a judgment against Stonehenge Engineering Corporation is not nearly so scary as the plaintiffs would like it to be; therefore, plaintiffs

17

altered their settlement demands accordingly. Nonetheless, I want to reiterate that Stonehenge is not in a position to contribute to the funding of the $400,000 settlement. . . .

(J.A. 310). This letter was before the district court below. Wausau also directs this court to the following statement in a footnote in the district court's order denying Stonehenge's motion to alter or amend judgment:

> [The Owners Association] agreed not to execute the Confession against National Stonehenge. Although execution is allowed against Stonehenge Engineering, that entity is probably judgment proof, a consideration certainly understood by [Stonehenge Engineering's] counsel, who represented [the Owners Association] in the underlying suit and was privy to this information.

(J.A. 198 n.1).

We agree with Wausau that the district court abused its discretion in using the $750,000 figure as a basis for apportioning Wausau's pro-rata share of the damages caused by Stonehenge Engineering Corporation. First, the letter to the Wausau adjuster is compelling evidence that Stonehenge Engineering Corporation never expected to pay a dime of the balance of its confessed judgment from its own resources. Second, the record is void of contradictory evidence on the issue. Indeed, the district court itself all but expressly recognized that Stonehenge Engineering never expected to pay a dime of the balance of its confessed judgment out of its own resources.

Because neither National Stonehenge Corporation nor Stonehenge Engineering Corporation ever expected to pay the balance due upon their respective confessions of judgment, Hitt counsels that we vacate the damage portion of the district court's judgment in favor of these two companies and remand this case to the district court for entry of judgment in their favor in the amount of $120,650, representing 25.4% of $475,000.**7**

_____

**7** Contrary to the position taken by the dissent, the fact that the district court and the state trial judge both found the $750,000 settlement figure

18

V.

In its cross appeal, Stonehenge contends the district court erred in refusing to award it interest at the South Carolina statutory rate for judgments of 14% per annum, see S.C. Code Ann. § 34-31-20 (Law. Co-op. 1987), from the date of the confessions of judgment (April 21, 1997) until the date of the entry of judgment on its breach of contract claim (August 14, 1998). Stonehenge requested such interest in its post judgment motion to alter or amend judgment. In its order denying Stonehenge's motion to alter or amend judgment, the district court stated:

> The record is devoid of any evidence that either of the plaintiffs can be held liable for post-[confessions of] judgment interest by virtue of the underlying [confessions of] judgment. To the contrary, the Settlement Agreement between [the Owners Association] and the plaintiffs clearly provides that [the Owners Association] can attempt to collect against Stonehenge Engineering only the deficiency remaining under the Confession of Judgment. The Settlement Agreement makes no provision for the recovery of interest.

(J.A. 198).

We fully agree with the district court's reasoning in refusing to award Stonehenge interest from the date of the confessed judgments to the date of the entry of judgment against Wausau on Stonehenge's breach of contract claim. We, therefore, affirm the district court on this point.[8]

_____

to be a fair and equitable amount to settle the litigation between the Owners Association and Stonehenge is completely irrelevant to the question before us, i.e., how much indemnification is due Stonehenge under the Three Wausau Policies. More specifically, the fact that the $750,000 settlement figure is fair and equitable has absolutely no bearing on the issue of whether Stonehenge intended to pay out of its own resources the excess of the confessions of judgment.

[8] We also affirm the district court's grant of Wausau's motion for summary judgment on Stonehenge's two bad faith claims, the other subjects of Stonehenge's cross-appeal. Our review of the evidence relied upon by Stonehenge in support of these claims reveals they are without merit.

19

VI.

In conclusion, we affirm the liability portion of the judgment against Wausau with respect to Stonehenge's breach of contract claim. We vacate, however, the damage portion of that judgment and remand for entry of judgment in favor of Stonehenge in the amount of $120,650. We affirm the district court's refusal to award Stonehenge interest from the date of the confessed judgments to the date of the entry of judgment against Wausau on Stonehenge's breach of contract claim. Finally, we affirm the district court's entry of judgment in favor of Wausau on Stonehenge's two bad faith claims.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I agree with Parts I, II, III, and V of the majority opinion, but respectfully have a difference of opinion as to the amount Wausau owes as discussed in Part IV. Unlike the majority, I believe Hitt v. Cox, 737 F.2d 421 (4th Cir. 1984), is inapplicable to this case, and therefore, I dissent.

I.

After experiencing substantial defects in the construction of the "Yacht Cove" condominium project, the Yacht Cove Owners Association ("Owners Association") sued the general contractors, National Stonehenge Corporation and Stonehenge Engineering Corporation (collectively "Stonehenge"), in state court and asserted actual damages in excess of $1.3 million as well as a right to punitive damages. The damage to the condominiums began on April 1, 1985 and continued until March 17, 1997. Stonehenge contended (and later proved) that insurance existed for a substantial portion of the damage period. The breakdown of coverage was as follows:

> 7/1/86 - 11/1/87 Maryland Casualty Insurance Company
> 11/1/87 - 11/1/91 Aetna Casualty and Surety Company

20

11/1/91 - 11/1/92 Home Insurance Company
11/1/92 - 11/1/95 Employers Insurance of Wausau

These insurance companies were notified of the lawsuit, and all except Wausau participated in the defense of Stonehenge. Despite repeated requests, Wausau refused to defend Stonehenge or to be involved in settlement negotiations.

On the day of trial, Stonehenge and the Owners Association reached a settlement in which all of the insurance companies, except Wausau, participated. The general terms were placed on the record in open court and in relevant part were as follows: Stonehenge Engineering Corporation and National Stonehenge Corporation agreed to confess judgment to the Owners Association in the amount of $750,000. With regard to the payments, the attorney presenting the settlement told the court:

> We also believe that the position of one carrier[,] Employer's Mutual of Wausau[,] and their denial of coverage to the defendants has placed Stonehenge in a precarious position. Three of Stonehenge's liability insurance carriers have agreed to pay the plaintiff the sum of $475,000 as follows: The Aetna Casualty Insurance Company will pay $300,000; the Maryland Insurance Company will pay $100,000; and the Home Insurance Company will pay $75,000.
>
> When the $475,000 payment is made to the plaintiff, that will be credited against the Confession of Judgment leaving a balance on the Confession of Judgment of $275,000. Stonehenge will give the three insurance carriers who are contributing to the resolution of the case a release from the Yacht Cove claim upon receiving these payments, and the payments have been agreed to be made to the plaintiff within 30 days from today: March 17th.

J.A. 24. At the conclusion of the presentation, the state trial judge made a specific finding, based upon his review of the file and the documentation supplied by the parties, that the settlement was "a fair and equitable resolution of the matter." J.A. 29.

21

The formal settlement documents were later signed memorializing the oral presentation made in open court. In addition to the terms related above, the Owners Association signed a covenant not to file or execute on the Confession of Judgment against National Stonehenge Corporation unless, in subsequent litigation,"Wausau successfully prove[d] and a [c]ourt of competent jurisdiction determine[d] that either [Stonehenge Engineering] or [National Stonehenge] were not named insureds or additional named insureds under the [three] policies of insurance [issued from 11/1/92 to 11/1/95] or _and_ [sic] no recovery is made against Wausau." J.A. 342 (emphasis in original).

The Owners Association gave no such covenant to Stonehenge Engineering, but did agree not to execute on the judgment against Stonehenge Engineering until all efforts to secure payment from Wausau had been completed and then only to the extent the judgment was left unpaid after the action against Wausau. In order to protect Stonehenge Engineering, the Owners Association agreed not to settle with Wausau for an amount less than what Stonehenge Engineering would owe under the Confession of Judgment, without prior approval from Stonehenge Engineering.

II.

Stonehenge subsequently brought this lawsuit against Wausau seeking, among other claims, payment by Wausau of the balance of the judgment owed by Stonehenge to the Owners Association -- $275,000. Ultimately, on cross-motions for summary judgment as to Stonehenge's breach of contract claim, the district court granted Stonehenge partial summary judgment against Wausau, finding that coverage did exist. The parties then stipulated that it was appropriate for the district court to allocate the amount of damages owed by Wausau. In so doing, the district court made a specific finding that the $750,000 settlement "was not entered into collusively and fraudulently and [was] a proper amount upon which to calculate the allocation." J.A. 185.

We review the grant of summary judgment to Stonehenge de novo, viewing the evidence in the light most favorable to Wausau. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). With regard to the allocation of damages by the district court,

22

we review the district court's legal determinations de novo, <u>see</u> <u>Neathery v. M/V Overseas Marilyn</u>, 700 F.2d 140, 143 n.2 (4th Cir. 1983), and its factual findings for clear error, <u>see Bonds v. Mortensen & Lange</u>, 717 F.2d 123, 125 (4th Cir. 1983).

III.

A.

Because of the impracticality of determining the actual amount of damage that occurred during each insurance period, the parties proposed various methods of allocation. As might be expected, Wausau submitted a proposal to the district judge in which it would pay as little as $33,125, while Stonehenge submitted a theory to justify as much as $259,575. Only two cases were cited to the district judge -- <u>Joe Harden Builders, Inc. v. Aetna Casualty & Surety Co.</u>, 486 S.E.2d 89 (S.C. 1997), and <u>Sentinel Insurance Co. v. First Insurance Co. of Hawaii</u>, 875 P.2d 894 (Haw. 1994). With this information, the district judge turned to the task the parties had given him.

He first had to determine an appropriate baseline for the allocation of damages. Wausau itself proposed only three choices: $750,000-- the amount of the Confession of Judgment; $625,000--Stonehenge's lowest offer to settle in 1997; and $475,000--the amount the other three insurance companies had paid which Wausau viewed as the settlement total. After reviewing the information, the district judge found that the $750,000 was a proper amount upon which to calculate allocation. Because there are ample reasons to justify the district court's finding, I would accept it.

First, the judge noted that the agreed cap of $750,000 was in settlement of an alleged claim of over $1.3 million in actual damages. Second, the district court found as fact that the settlement amount was not the result of any collusion or fraud, and as he reminded in his order, the state trial judge had also found the settlement figure to be fair and equitable. Third, the $750,000 figure approximated amounts which had been discussed in prior settlement negotiations between the Owners Association and Stonehenge. And lastly, the district judge pointed out that the use of the settlement amount would result in Wausau making a coverage payment roughly in proportion to the payments

23

previously made by the other carriers based upon the number of years each had insured Stonehenge. Because each one of these reasons is sound, I would uphold the district court's finding of $750,000 as the proper basis for damages and the appropriate starting point in the allocation process.

B.

Rejecting the district court's rationale for allocating damages based upon the settlement amount of 750,000, the majority instead takes the position that the basis for allocation of damages is $475,000, which represents the total already paid by the other three insurance companies. I disagree for several reasons.

First, rejection by the majority of the Confession of Judgment amount is based on Hitt v. Cox, 737 F.2d 421 (4th Cir. 1984). This case, however, was never cited to the district court during the allocation process. Its use here concerns me for a number of reasons, not the least of which is the fact that I do not believe it is dispositive of our case.

In Hitt, the insured defendant settled the underlying lawsuit for $500,000, but only agreed to personally pay the injured plaintiff $350,000. The remaining $150,000 would only be paid if the insured successfully obtained indemnification from its insurance company for an amount up to the policy limits of $500,000. In other words, the insured's legal obligation to pay the additional $150,000 was directly contingent on its success in the indemnification action against the insurance company. We condemned such an arrangement and denied indemnification to the insured because, after settlement, the insured would never be obligated to contribute another dollar from its own pocket. Thus, the underlying premise of Hitt was that the insured had fully extinguished its personal exposure through the settlement for $350,000 and, therefore, had nothing to lose by guaranteeing the injured party more money so long as the additional money would only be paid if the indemnification suit against the insurance company produced it.

The obvious difference in the case before us is that National Stonehenge and Stonehenge Engineering from the outset of the settlement had personal liability for the entire settlement amount. The Confession of Judgment was a valid judgment against both National Stone-

24

henge and Stonehenge Engineering. National Stonehenge would be obligated to pay the judgment personally if the contingencies described in the settlement agreement came to pass.

For Stonehenge Engineering, the Confession of Judgment stands as a very real liability as well. Stonehenge Engineering is not immune from execution of the judgment if the action against Wausau fails or falls short of providing funds with which to satisfy the Confession of Judgment. Liability for the amount not paid by the three insurance companies, $275,000, continues against Stonehenge Engineering.

Wausau nevertheless strains to invoke Hitt on the theory that neither National Stonehenge nor Stonehenge Engineering ever expected, as a practical matter, to pay the judgment. In so doing, Wausau necessarily first tries to focus our attention on events which developed after the settlement. Specifically, Wausau wants us to view National Stonehenge as having had no exposure at the time of settlement because now it has been established that both National Stonehenge and Stonehenge Engineering were insureds under the Wausau policies and the district judge has determined there will be recovery against Wausau. In light of these findings, National Stonehenge is now cleared of any liability.

In Hitt, unlike the case before us, the insured's responsibility to pay did not exist upon settlement, but arose only after indemnification litigation was pursued against the insurance company and then only if pursued to a successful conclusion. However, in circumstances like these, the financial exposure of a party to a settlement must be determined as of the date of settlement and not in the light of how legitimate uncertainties later resolve themselves. When National Stonehenge settled the case with the Owners Association, National Stonehenge was liable for the balance due with only filing of the judgment and execution thereon withheld pending resolution of the contingencies in a subsequent and separate court proceeding. The fact that National Stonehenge was ultimately relieved of responsibility does not change the fact that when it settled the case, National Stonehenge had committed itself to liability. Consequently, I find no basis in Hitt to disregard the settlement amount agreed to by National Stonehenge.

Wausau also seeks to invalidate Stonehenge Engineering's liability for the settlement by alleging that Stonehenge Engineering was insol-

25

vent and hence had nothing to lose by settling the case for any amount. In making this argument, Wausau seeks to equate the insured in Hitt with Stonehenge Engineering by claiming that neither had any incentive to limit the amount of the settlement. From this Wausau argues that the agreement to pay more than $475,000 was a sham and that Hitt dictates that the excess be disregarded. In my opinion, this extends Hitt far beyond its intended effect.

Hitt does not deal with the insolvency of a party to a settlement. Rather, Hitt's reference to payment from an insured's personal resources was, in my view, merely to contrast that payment from payment which would be legally due only after successful indemnification actions against insurance companies. Nowhere in Hitt is there a reason to condition payment by an insurance company of a settlement amount on the personal resources of an insured. Yet Wausau wants to read Hitt as authority for it to ignore the validity of a settlement amount solely because its insured may have been unable to pay at the time. I cannot agree. Accepting this argument, in my opinion, is tantamount to changing the terms of the very insurance contract at issue. Wausau agreed to pay on behalf of Stonehenge Engineering (and National Stonehenge) "those sums that the insured becomes legally obligated to pay as damages because of . . . `property damage' to which this insurance applies." J.A. 365. Nowhere in the contract is the solvency of the insured a condition of payment, nor is there any such limitation on indemnification for a settlement. And, as has been shown previously, the insureds had a legal obligation to pay the Confession of Judgment.

Of course, an insurance company is not without protection. It has long been established that "[w]hen the insured in a liability policy settles a claim in litigation against him without trial, the questions which are open for consideration in a suit by the insured to the policy include those which relate to coverage, liability and the extent thereof." Employers Mut. Liab. Ins. Co. of Wisconsin v. Hendrix, 199 F.2d 53, 57 (4th Cir. 1952). Thus, the reasonableness of a settlement "is a proper subject of inquiry." Id. at 60; see also Hitt, 737 F.2d at 425. But in the case before us, the state trial court specifically concluded that the settlement was fair and reasonable and, in partial reliance thereon, the district court found that there was no evidence of fraud or collusion. Hence, I see no reason, and certainly no basis in the insurance contract, to disregard the settlement amount and leave

26

the insured at risk on the presumption that the insured will never want to pay, or be able to pay, the judgment against it.

C.

Even if <u>Hitt</u> is somehow applicable, and Stonehenge Engineering's fiscal status is relevant, we still should not enter judgment at this time. There have never been any findings of fact as to the financial status of Stonehenge Engineering -- it has never been litigated. If Wausau's responsibility to pay is dependent on whether Stonehenge Engineering was solvent at the time it entered into the settlement, Stonehenge Engineering is entitled to prove that it was solvent. Wausau asks us to excuse litigation of this question before the district court and, instead, to decide this factual dispute ourselves from the fragments of evidence which happen to appear in the Joint Appendix. I cannot sanction resolution of this issue in Wausau's favor when Stonehenge Engineering has never had a chance, much less a need, to present evidence of its solvency.

IV.

As stated previously, I agree with the district judge that the correct damage basis is $750,000. After deciding this, the district judge proceeded to compute the proportion of damage Wausau should bear. Specifically, after determining the period during which the damage occurred, the judge found that Wausau's insurance coverage between November 1, 1992 and November 1, 1995 accounted for 25.4 percent of the total damage period. Then, utilizing the total damage figure of $750,000, the judge determined that Wausau owed $190,500 from its $1 million coverage.

The majority agrees that Wausau had coverage for 25.4 percent of the damage period, but limits the judgment to Stonehenge to $120,650 -- a figure calculated upon what the three other insurance companies collectively agreed to pay, in varied amounts depending upon their respective coverage periods. I confess to being unable to understand how the majority reaches this result.

As an initial premise, I am not so willing as the majority to presume that Maryland Casualty, Aetna, and Home Insurance, which collectively had coverage for only a little over half of the total damage period, agreed to pay the total amount of actual damages. Further-

27

more, if <u>Hitt</u> controls, as the majority believes, and any amount agreed to be paid over and above the amount the other insurance companies agreed to pay is "patently unreasonable" and "invalid," <u>Hitt</u>, 737 F.2d at 426, then it seems that no additional money should be paid to Stonehenge, leaving Wausau with no obligation at all. Further, if Wausau's responsibility is to be a percentage of the $475,000 already paid in full by the other insurance companies, requiring Wausau to pay $120,650 will actually result in Stonehenge recovering an amount over and above the $475,000.

These anomalies, in my judgment, show that the resolution the trial judge reached was fair and eminently reasonable. The chart below reflects his decision. A comparison of the amounts actually paid by the other insurance companies to the allocations the district judge used in his independent determination reflects the fairness of his decision.

**EQUITABLE ALLOCATION OF DAMAGES OCCURRING FROM 11/1/85 TO 3/17/97**

| Carrier | Dates of Coverage | Number of Years of Coverage | Percentage of Time There Was Coverage | Proportion of Damages Due Per District Court | Actually Paid |
|---|---|---|---|---|---|
| Initial Carrier or Stonehenge[1] | 4/1/85 to 7/1/86 | 1.25 | .106 | 79,500 | |
| Maryland Casualty | 7/1/86 to 11/1/87 | 1.33 | .113 | 84,750 | 100,000 |
| Aetna | 11/1/87 to 11/1/91 | 4 | .339 | 254,250 | 300,000 |
| Home Insurance | 11/1/91 to 11/1/92 | 1 | .085 | 63,750 | 75,000 |
| Wausau | 11/1/92 to 11/1/95 | 3 | .254 | 190,500 | [120,650][2] |
| Final Carrier or Stonehenge | 11/1/95 to 3/17/97 | 1.21 | .103 | 90,750 | |

_____

**1** According to the district court:

> The record does not identify the initial and final insurance carriers during the trigger period. The identity of these carriers, or

28

Although the other insurance companies paid more in settlement than would have been called for under the district judge's calculations, the differences are, in my opinion, minimal. If anything, Wausau would obviously benefit financially from the fact that the assessment of its responsibility was made with the cool reflection of a district judge rather than in the heat of a state court battle with the prospect of a large actual and punitive damage verdict staring it in the face.

V.

In conclusion, I would accept the sum of $750,000 as a proper basis for the allocation of Wausau's share of the damages, and I would affirm the district court's method of computing the specific sum due from Wausau. Therefore, I respectfully dissent from Part IV of the majority's opinion.

_____

whether any coverage even existed during those periods, is immaterial for the purpose of establishing Wausau's equitable share. The Court's calculation is based on proportioning damages throughout the duration of the entire trigger period. If the plaintiffs did not have coverage in the first and last periods, then they would be responsible for the damages that are apportioned to those periods.

J.A. 192.

**2** This amount reflects Wausau's share per the majority opinion.

29