STATE of Wisconsin, Plaintiff,

v.

HYDRITE CHEMICAL COMPANY a/k/a Avganic Industries, Inc., Defendant-Third-Party Plaintiff-Appellant-Cross-Respondent,†

v.

TRAVELERS CASUALTY & SURETY COMPANY f/k/a Aetna Casualty & Surety Company, American Casualty Company of Reading, PA, Chicago Insurance Company, Continental Casualty Company, First State Insurance Company and First State Underwriters Agency of New England Reinsurance Corp. a/k/a New England Reinsurance Corp., Granite State Insurance Company, Great American Surplus Lines Ins. Co. a/k/a American Empire Surplus Lines Ins. Co., International Surplus Alliance Insurance Co. a/k/a International Insurance Co., Certain Underwriters at Lloyds of London a/k/a Certain London Insurers, and Affiliated FM Insurance Company, Third-Party-Defendants,

AMERICAN MOTORISTS INSURANCE COMPANY, Home Indemnity Company and Home Insurance Company, Northbrook Excess & Surplus Insurance Company, as predecessor to Allstate Insurance

---

† Petition to review filed.

Company, and United States Fire Insurance Co.,
Third-Party Defendants-Respondents-Cross-
Appellants,

INTERSTATE FIRE AND CASUALTY COMPANY, Fourth-
Party Plaintiff,

v.

MARYLAND CASUALTY COMPANY, Fourth-Party
Defendant. [Case No. 00–3344.]

STATE of Wisconsin, Plaintiff,

v.

HYDRITE CHEMICAL COMPANY a/k/a Avganic Indus-
tries, Inc., Defendant-Third-Party Plaintiff-
Appellant,†

v.

TRAVELERS CASUALTY & SURETY COMPANY f/k/a Aetna
Casualty & Surety Company, American Casualty
Company of Reading, PA, Chicago Insurance
Company, Continental Casualty Company, First
State Insurance Company and First State Under-
writers Agency of New England Reinsurance
Corp. a/k/a New England Reinsurance Corp.,
Granite State Insurance Company, Great Ameri-
can Surplus Lines Ins. Co. a/k/a American Em-
pire Surplus Lines Ins. Co., International Surplus
Alliance Insurance Co. a/k/a International Insur-
ance Co., Certain Underwriters at Lloyds of Lon-

† Petition to review filed.

don a/k/a Certain London Insurers, and Affiliated FM Insurance Company, Third-Party-Defendants,

AMERICAN MOTORISTS INSURANCE COMPANY, Home Indemnity Company and Home Insurance Company, Northbrook Excess & Surplus Insurance Company, as predecessor to Allstate Insurance Company, and United States Fire Insurance Co., Third-Party Defendants-Respondents,

INTERSTATE FIRE AND CASUALTY COMPANY, Fourth-Party Plaintiff,

v.

MARYLAND CASUALTY COMPANY, Fourth-Party Defendant. [Case No. 01–0580.]

Court of Appeals

*Nos. 00–3344, 01–0580. Oral argument May 23, 2002.—Decided August 1, 2002.*

2002 WI App 222

(Also reported in 652 N.W.2d 828.)

On behalf of the defendant-third-party plaintiff-appellant-cross-respondent, the cause was orally argued by *Gordon Giampietro* and submitted on the briefs of *Raymond R. Krueger, Douglas P. Dehler*, and *Cynthia E. Smith* of *Michael Best & Friedrich LLP*, Milwaukee.

On behalf of the third-party defendants-respondents-cross-appellants, American Motorists Insurance Company and Northbrook Excess & Surplus Insurance Company, as predecessor to Allstate Insurance Company, the cause was orally argued by *Michael W. Morrison*, and submitted on the briefs of *Robert S. Soderstrom, Michael W. Morrison*, and *Dale R. Kurth* of *Tressler, Soderstrom, Maloney & Priess*, Chicago, IL.

On behalf of the third-party defendants-respondents-cross-appellants, Home Indemnity Company and Home Insurance Company, the cause was orally argued by *Alyssa M. Campbell*, and submitted on the briefs of *Anthony P. Katauskas, Alyssa M. Campbell*, and *Mary A. Sliwinski* of *Williams Montgomery & John Ltd.*, Chicago, IL, and *Richard G. Niess* of *Coyne, Niess, Schultz, Becker & Bauer*, Madison.

On behalf of the third-party defendant-respondent-cross-appellant, United States Fire Insurance Company, the cause was orally argued by *Michael Resis*, and submitted on the briefs of *Michael Resis* and *Timothy J. Fagan* of *O'Hagan, Smith & Amundsen, L.L.C.*, Chicago, IL, and *Patrick J. Lubenow* of *O'Hagan, Smith & Amundsen, L.L.C.*, Milwaukee.

Before Vergeront, P.J., Deininger and Lundsten, J.J.

¶ 1. VERGERONT, P.J. The primary issue we decide on this appeal and cross-appeal requires us to construe the same insurance policy language at issue in *City of Edgerton v. General Casualty Co. of Wisconsin*, 184 Wis. 2d 750, 517 N.W.2d 463 (1994), in the context of a different fact situation. The issue is whether the term "damages" in the provision that the insurance company "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages" includes the relief the State seeks in this action against the insured, Hydrite Chemical Company. We conclude that, even though the State's claim is denominated a nuisance claim, the substance of the relief the State seeks is to compel Hydrite to meet its environmental cleanup obligations under federal and state law, and, under *Edgerton*, the costs of meeting those obligations are not "damages" as used in the insurance policies. Accordingly, Hydrite's insurance policies do not provide coverage. We therefore affirm the circuit court's order granting summary judgment in favor of the insurance companies, although it did so on different grounds.[1]

---

[1] Of the insurers originally sued, a number have been dismissed for reasons not relevant to this appeal. The insurers involved in this appeal as respondents and cross-appellants are: American Motorists Insurance Company (AMICO); Home Indemnity Company and Home Insurance Company; Northbrook Excess & Surplus Insurance Company (as predecessor to Allstate Insurance Company); and United States Fire Ins. Co. We will refer to these respondents and cross-appellants collectively as "the insurers."

Affiliated FM Insurance Company and First State Insurance Co. and First State Underwriters Agency of New England Reinsurance Corp. were voluntarily dismissed during this ap-

¶ 2. The only other issue we decide is whether, as Hydrite claims, the circuit court erred in concluding that Home Insurance Company was not obligated to pay Hydrite's defense costs. We affirm the circuit court's ruling on this issue for the reasons we explain below.

## BACKGROUND

¶ 3. This action arises out of groundwater contamination on property Hydrite Chemical Company owns in Cottage Grove, Wisconsin, on which it operates a solvent reclamation facility. The exact causes[2] and extent of the contamination are not relevant for purposes of the issues we decide, nor are the dates on which Hydrite learned of the causes and extent of the contamination. It suffices to state there is no dispute that by July 1983, Hydrite had received a report indicating the presence of some groundwater contamination. Also in 1983, Hydrite applied for a permit under the federal Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901–6992k, to accept and store hazardous waste. The permit, issued in June 1989, required that Hydrite implement a corrective action plan (CAP) to investigate and clean up the site.[3] On January 22, 1991, Hydrite notified the insurance com-

---

peal, and we therefore omit reference to them when summarizing the proceedings in circuit court.

[2] The RCRA Corrective Action Plan states that the contamination found to date at and around the facility were "by and large, unrelated to [Hydrite's] current activities at the site but instead stems from the activities of a former site owner, North Central Chemical."

[3] Hydrite challenged three specific aspects of the CAP, but accepted all other provisions, which became effective on June 30, 1989; the challenged aspects were formally resolved by July 27, 1992.

panies that had issued it comprehensive general liability insurance policies, both primary and excess, of the groundwater contamination. The insurance policy language at issue on this appeal is: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies."[4] After the companies denied Hydrite's request for indemnification for the sums Hydrite had paid and would be paying for its investigation and cleanup obligations under the CAP, Hydrite filed an action seeking indemnification for those costs. This court held that the costs Hydrite had incurred and would incur in the investigation and cleanup were not "legal damages" under *Edgerton*, and the insurers were therefore not required to indemnify Hydrite under the terms of the insurance policies. *Hydrite Chem. Co. v. Aetna Cas. & Sur. Co.*, 220 Wis. 2d 26, 34, 582 N.W.2d 423 (Ct. App. 1998) (*Hydrite I*), *review denied*, 220 Wis. 2d 363, 585 N.W.2d 156 (Wis. Aug. 21, 1998) (No. 94–0032).

¶ 4. Meanwhile, the Wisconsin Department of Natural Resources (DNR) became dissatisfied with Hydrite's progress in fulfilling its CAP obligations.[5] In

---

[4] Where the insurance policy language varies from that quoted, the differences are not relevant to this appeal.

[5] In April 1992, the Federal Environmental Protection Agency (EPA) began delegating to the DNR supervisory authority over RCRA-CAP's in Wisconsin. The DNR also became the lead agency for certain sites that it decided were not progressing in the cleanup process as they should. In 1995, the DNR became the lead agency for Hydrite. Hydrite's permit was modified to incorporate corrective measures for groundwater quality under WIS. ADMIN. CODE ch. NR 140; these are the equivalent of the CAP under RCRA. We will use "CAP" to include the corrective measures required of Hydrite under both federal and state law.

November 1995, the State of Wisconsin filed this action against Hydrite, alleging that there had been spills of hazardous substances at Hydrite's Cottage Grove facility that had contaminated the soil and groundwater; that this had the potential to contaminate Cottage Grove's municipal well; and that the contamination had affected use by bicyclists of the adjacent state-owned Glacial Drumlin Trail and limited DNR's ability to develop the trail. The complaint asserted two claims for relief. First, Hydrite violated WIS. STAT. § 292.11(3) (1999–2000),[6] the Spills Law, by discharging hazardous substances and failing to take actions necessary to restore the environment. Second, Hydrite's violation of the Spills Law was a public nuisance under WIS. STAT. § 823.01. This latter claim alleged that under WIS. STAT. § 281.01(18), "groundwater" is included in the waters that the State owns, and that the contamination had spread to groundwater used as a public water supply for Cottage Grove.[7] The complaint sought mon-

---

[6] WISCONSIN STAT. § 292.11(3) provides:

> (3) RESPONSIBILITY. A person who possesses or controls a hazardous substance which is discharged or who causes the discharge of a hazardous substance shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands or waters of this state.

At the time the complaint was filed, this section was numbered WIS. STAT. § 144.76(3). *See* 1995 Wis. Act 227, § 704 (effective Jan. 1, 1997).

All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[7] The State also claimed a violation of 42 U.S.C. § 9607(a) for damages for injury to, destruction of, or loss of natural resources; however, it later agreed to dismiss this claim.

etary damages to compensate for the injuries to natural resources and for environmental injuries as a result of the impact on the use and enjoyment of the bike trail, an injunction requiring compliance with the Spills Law, statutory forfeitures, and penalties.

¶ 5. Hydrite immediately filed third-party complaints against its insurers seeking a declaration of the insurers' obligations to defend and indemnify, and seeking damages for breach of contract. Within a month, the insurers moved to bifurcate the issues of coverage and liability and to stay the latter. On January 5, 1996, with the consent of the parties, the court entered an order doing so. That order provided that the stay did not prohibit the State and Hydrite from settlement discussions.

¶ 6. Proceedings on insurance coverage continued, involving various discovery disputes not related to this appeal. Eventually, the insurers filed motions for summary judgment on a number of grounds, including the ground that the sums the State was seeking from Hydrite were not "damages" under *Edgerton*. Hydrite responded that it was entitled to summary judgment on this issue.[8]

¶ 7. During these proceedings on coverage, Hydrite entered into three "partial settlement agreements" with the State, dated April 9, 1996, August 3, 1998, and September 3, 1999. Each provided that Hydrite pay money to the State for deposit into a settlement fund that earned interest as Hydrite performed enumerated investigation and remediation tasks. As Hydrite performed the tasks, the monies in the settlement fund

---

[8] On the other grounds raised in the insurers' motions, Hydrite contended either that it was entitled to summary judgment or that disputed issues of fact made summary judgment inappropriate.

attributable to the tasks were to be returned to Hydrite with interest. In exchange, the State agreed to release Hydrite from liability for damages to natural resources, including groundwater, as measured by costs and expenses for those tasks enumerated in the agreement. The first agreement also completely released Hydrite from all damages relating to natural resources, including groundwater, except those measured by the cost of repair, restoration, and rehabilitation; the release included damages measured by any means other than the cost of repair, restoration, and rehabilitation, such as loss of use, diminution of market value, and loss of aesthetic and other value. The later two partial settlement agreements contained similar release provisions. With respect to the Glacial Drumlin Trail, Hydrite agreed to provide a non-exclusive, permanent easement to the State for the purpose of establishing access to the trail and a trailhead. Other damages to the Glacial Drumlin Trail were governed by the release provisions already explained: Hydrite was released from liability for all damages except those measured by the costs of repair, restoration, and rehabilitation.

¶ 8. In its decision on summary judgment, the circuit court concluded that on the State's claim that Hydrite violated the Spills Law, the State was not seeking "damages" within the meaning of the insurance policies. However, the court concluded, the compensation the State sought on its nuisance claim was "damages." The court reasoned that the State was asserting the nuisance claim as a property owner—owner of the groundwater and property in and about the Cottage Grove site—and not as a governmental agency enforcing the Spills Law. One traditional measure of damages for a nuisance claim, the court held, was the cost of

restoring the property, and therefore these costs were "damages" as used in the insurance policies.

¶ 9. However, the court also decided, based on the undisputed facts, that Hydrite had breached the "voluntary payment" and "no action" clauses of certain insurance policies when it entered into the CAP under RCRA without the knowledge of those insurers. The court therefore dismissed Hydrite's third-party action against American Motorists Insurance Company, Home Indemnity Company and Home Insurance Company, and Northbrook Excess & Surplus Insurance Company (as predecessor to Allstate Insurance Company). As to United States Fire Insurance Company, the court concluded that, based on the undisputed facts, the damages sought by the State were expected by Hydrite and were a known loss in July 1983; it therefore dismissed Hydrite's action against this insurer.

¶ 10. In addition, the circuit court ruled that Home Insurance was not obligated to pay Hydrite's costs in defending the State's action against it because Home had sought and been granted a stay of the litigation on Hydrite's liability to the State until the coverage issue was resolved.[9]

¶ 11. The court made a number of other rulings, but we note only these. The court decided, based on the undisputed facts, that Hydrite had violated the notice provision in certain policies, but that there were disputed issues of fact precluding summary judgment on the grounds of notice as to other policies. It also decided that the groundwater was a "watercourse" within the meaning of an exclusion in Northbrook's policy.

---

[9] The court ruled on this issue in the context of Hydrite's motion for reconsideration.

565

## DISCUSSION

■■■

¶ 12. In reviewing a circuit court's grant or denial of summary judgment, we employ the same methodology as the circuit court, and our review is de novo. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). A party is entitled to summary judgment if there are no genuine issues of material fact and the party is entitled to summary judgment as a matter of law. WIS. STAT. § 802.08(2).

¶. 13. On appeal, Hydrite challenges the circuit court's rulings on the voluntary payment/no action clauses, the known loss doctrine, timeliness of notice, the watercourse exclusion, and Home's obligation to pay Hydrite's defense costs. On their cross-appeal, the insurers challenge a number of other rulings, including the ruling that the compensation the State seeks on its nuisance claim is "damages" within the meaning of the policy language. We address this issue first, and because of our resolution of this issue, we do not address any other issue on the appeal or cross-appeal, except Hydrite's claim that Home is obligated to pay its defense costs. On both issues we decide, the parties agree that there are no genuine issues of material fact. Therefore, the question on each issue is which party is entitled to judgment as a matter of law.

¶ 14. We begin with a detailed discussion of *Edgerton* and two subsequent cases discussing it, *General Casualty Co. of Wisconsin v. Hills*, 209 Wis. 2d 167, 561 N.W.2d 718 (1997), and *Wisconsin Public Service Corp. (WPS) v. Heritage Mutual Insurance Co.*, 209 Wis. 2d 160, 561 N.W.2d 726 (1997). The policies at issue in these three cases contained essentially the same language as the language in Hydrite's policies—that the

insurer would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies." *Edgerton*, 184 Wis. 2d at 769; *Hills*, 209 Wis. 2d at 173; *see WPS*, 209 Wis. 2d at 163. These three cases, together with *Hydrite I*, provide the framework for our analysis of the meaning of the "damages" provision in the insurance policies.

¶ 15. In *Edgerton*, the groundwater became contaminated on property owned by Edgerton Sand & Gravel (ES&G), which the City of Edgerton had leased and used as its landfill. *Edgerton*, 184 Wis. 2d at 758–59 & n.5. Both ES&G and the city received letters from DNR asking them to propose a plan for remediation of the site and any problems associated with it; the letters stated that failure to respond within thirty days would result in listing the site on CERCLA's[10] National Priorities List or "state action." *Id.* at 760–62. When ES&G's and the city's insurers refused to provide a defense and to cover any liability they might have, they filed an action requesting a declaration that the insurers were obligated to defend and indemnify them for any liability arising out of DNR or EPA claims, actions, or suits involving the landfill. *Id.* at 762.

¶ 16. The court in *Edgerton* relied on its analysis in *School District of Shorewood v. Wausau Insurance Cos.*, 170 Wis. 2d 347, 368–70, 488 N.W.2d 82 (1992), in which it held that "damages" as used in this insurance policy provision unambiguously means "legal damages" —that is, legal compensation for past wrongs or injuries, generally pecuniary in nature—and does not include the cost of complying with an injunctive decree.

---

[10] Comprehensive Environmental Response, Compensation, and Liability Act, codified at 42 U.S.C. § 9601–9675.

*Edgerton*, 184 Wis. 2d at 783 (citing *Shorewood*, 170 Wis. 2d at 368). The *Edgerton* court reasoned that response and remediation costs assigned under CER-CLA or analogous state statutes are equitable relief, not damages:[11]

> response costs were not designed to compensate for past wrongs; rather, they were intended to deter any future contamination by means of injunctive action, while providing for remediation and cleanup of the affected site. This type of relief is distinct from that which is substitutionary—monetary compensation provided to make up for a claimed loss.

*Id.* at 785.

¶ 17. The supreme court subsequently considered *Edgerton* in *Hills*, decided *Edgerton* was factually distinguishable, and concluded that the remedy sought in *Hills* against the insured was "damages" within the meaning of the insurance policies. Hills operated a service station, and had contracted with Arrowhead Refining Company to pick up waste from that operation. *Hills*, 209 Wis. 2d at 171. When Arrowhead was sued by the United States for contamination of the site where it operated a waste-oil recycling business, Arrowhead filed a third-party complaint against Hills, seeking recovery for response costs associated with the site. *Id.* at 172. Hills' insurer refused to defend Hills, arguing that under *Edgerton*, "damages" did not include reimbursement for response and remediation costs. *Hills*, 209 Wis. 2d at 177.

---

[11] The court in *Edgerton* also held that that the letters from DNR were not a "suit," as specified in those insurance policies. *City of Edgerton v. General Cas. Co. of Wis.*, 184 Wis. 2d 750, 781–82, 517 N.W.2d 463 (1994). This is not an issue in this appeal.

¶ 18. The *Hills* court held that *Edgerton* was factually distinguishable because neither the EPA nor DNR had requested or directed Hills to develop a remediation plan or incur response and remediation costs under CERCLA or an equivalent state statute.[12] *Hills*, 209 Wis. 2d at 180. The court also held that *Shorewood* was factually distinguishable because Hills was not being sued to comply with an injunction. *Hills*, 209 Wis. 2d at 180. The court concluded that "Arrowhead does not want Hills to take, or [to] refrain from taking, any action. Instead, Arrowhead seeks substitutionary, monetary relief to compensate for the losses [it] may incur. The remedy that Arrowhead seeks is intended to compensate for past wrongs, not to prevent future harm." *Id.* at 181. The court therefore concluded that under *Shorewood* and *Edgerton*, Arrowhead was seeking "damages" as that word was used in the insurance policies. *Hills*, 209 Wis. 2d at 181.

¶ 19. Relying on *Hills*, the supreme court reached the same result in *WPS*. WPS sought reimbursement from an independent contractor's insurer for investigation and remediation costs WPS had incurred in cleaning up a site pursuant to an order from the DNR; the site had been contaminated when the contractor cut an underground pipe carrying fuel oil. *WPS*, 209 Wis. 2d at 164. The court stated:

> In [*Hills*], this court held that where parties other than the EPA or DNR seek recovery from an insurer for damages its insured allegedly inflicted through con-

---

[12] The court in *Hills* also observed that, unlike *Edgerton*, the contaminated property did not fit within the owned-property exclusion in the policies—although the court recognized that the court in *Edgerton* did not reach the issue of the owned-property exclusion. *General Cas. Co. of Wis. v. Hills*, 209 Wis. 2d 167, 180 & n.14, 561 N.W.2d 718 (1997).

tamination o[f] property that does not fit within an owned-property exclusion,[13] the suit seeks "damages" under an insurance policy. The present case similarly involves parties other than the EPA or DNR seeking recovery for damages that . . . the insured[] negligently caused through contamination of property that does not fit within the owned-property exclusion, because such property was not owned, rented, or occupied by [the insured].

*Id.* at 165 (footnote added).

¶ 20. As we have stated above, in *Hydrite I* this court relied on *Edgerton* in holding that Hydrite's insurers were not required under the policy terms to indemnify Hydrite for "the cost of its environmental investigation and remediation at the Cottage Grove facility, including the development and implementation of the [CAP] pursuant to the RCRA [permit because t]hese costs are not 'legal damages' under *Edgerton*." *Hydrite I*, 220 Wis. 2d at 34. We reasoned that under the terms of the CAP, "Hydrite was not required to pay the EPA substitutionary, monetary relief to compensate for past wrongs. Instead, Hydrite was required to develop and implement a [CAP] to address environmental contamination at the Cottage Grove facility." *Id.* at 34. We rejected Hydrite's arguments that *Hills* and *WPS*, not *Edgerton*, governed, stating:

The distinction . . . that is most important here is that in *Edgerton*, the DNR directed the insureds to develop a remediation plan and incur remediation and response costs; while in *Hills*, parties other than the EPA or

[13] See footnote 12.

DNR sought compensatory, monetary relief from the insured for alleged past contamination of property.[14]

*Hydrite I*, 220 Wis. 2d at 38–39 (footnote added). We concluded that *Edgerton*, not *Hills*, controlled because "like the insureds in *Edgerton*, Hydrite was responding to a governmental directive when investigating and remediating its contaminated property; unlike the insureds in *Hills*, Hydrite was not responding to a demand for compensatory, monetary relief from a nongovernmental third-party." *Hydrite I*, 220 Wis. 2d at 40.[15]

---

[14] Hydrite argued in *Hydrite I* that its claims involved damage to third-party property, as well as its own, while in *Edgerton* the contaminated property was owned by the insured. We described this distinction between *Hills* and *Edgerton* as "of marginal significance," because *Edgerton* did not reach the issue of whether the owned-property exclusion applied, since that was irrelevant if there was no coverage for other reasons; likewise, we pointed out, if the costs Hydrite incurred in implementing the CAP were not "damages," it is irrelevant whether its insurance policies also include an owned-property exclusion. *Hydrite Chem. Co. v. Aetna Cas. & Sur. Co.*, 220 Wis. 2d 26, 38, 582 N.W.2d 423 (Ct. App. 1998) (*Hydrite I*).

[15] In a subsequent decision, we relied on *Hydrite I* in concluding that no insurance coverage exists because of the "damages" provision where the insured is responsible for at least part of the contamination of a site, has been directed by a government to remediate the site and is later sued by the government to recover money the government spent to clean up the site. *Johnson Controls, Inc. v. Employers Ins. of Wausua*, 2002 WI App 30, ¶ 7, 250 Wis. 2d 319, 640 N.W.2d 205, *review granted*, 2002 WI 48, 252 Wis. 2d 148, 644 N.W.2d 685 (Wis. Apr. 22, 2002) (No. 01–1193).

■

¶ 21. The insurers here argue that the circuit court erred in deciding that the remedy the State sought on its nuisance claim was "damages" within the meaning of their insurance policies because this claim was in substance an effort to recover the response and remediation costs, which we held were not damages in *Hydrite I*. The insurers contend that the circuit court's distinction between the State seeking a remedy as a law enforcer and the State seeking a remedy as a property owner does not have a basis in the case law. Moreover, assert the insurers, this distinction wholly undermines the distinction made in *Edgerton* between cleanup costs required by statute, on the one hand, and substitutionary compensation for loss, on the other.

¶ 22. Hydrite responds that *Hills* and *WPS* establish that the remedy the State seeks for the nuisance claim—the cost of restoring property damaged by pollution—constitutes "damages." Hydrite finds support for its position in these two cases because in each the property owner was required by DNR to perform clean up, yet those costs were considered "damages" within the meaning of the insured's policy. According to Hydrite, the State, like Arrowhead and WPS, is a third-party property owner whose property has been damaged, and the fact that it also is the enforcer of Hydrite's cleanup obligations and that the partial settlements limit the State's recovery to the cleanup costs—the costs of repair, restoration, and rehabilitation—has no bearing on whether the remedy the State seeks is "damages" within the meaning of the insurance policies. Hydrite emphasizes that it is not seeking coverage for the costs of complying with the

CAP, but only for the sums it becomes legally obligated to pay by judgment or settlement because of the State's nuisance claim.

¶ 23. Our goal in interpreting insurance policies is to ascertain and carry out the intentions of the parties. *Edgerton*, 184 Wis. 2d at 779–80. We give words their plain and ordinary meaning, and we assess the meaning by asking what a reasonable person in the position of the insured would have understood the words to mean. *Id.* at 780; *Hills*, 209 Wis. 2d at 175. This is the method of analysis the court in *Edgerton* employed in deciding that "damages" did not include the costs an insured incurs in removing hazardous materials and preventing future harm. *See Edgerton*, 184 Wis. 2d at 783–85.

¶ 24. We have already determined in *Hydrite I* that Hydrite's obligations under the CAP are not "damages" within the meaning of the insurance policies, and Hydrite implicitly concedes that its obligations under the analogous state statutes also are not "damages." The circuit court concluded there was no dispute that the tasks for which payment was made under the partial settlement agreements are those Hydrite is obligated to perform under the CAP. The court also concluded there was no dispute that the release by the State of any further claim for nuisance damages beyond those measured by "the costs and expenses of any activities necessary to repair, restore or rehabilitate such injured natural resources and other property," and specifically the release of any further claim against Hydrite for "damages as measured by any other means," leaves Hydrite exposed to liability solely for costs for tasks that Hydrite is obligated to perform under the CAP. Hydrite does not argue that the circuit court erred

573

in making these rulings, and we conclude the circuit court was correct. It is also undisputed that under the partial settlement agreements, if Hydrite performs the cleanup tasks in a manner satisfactory to the State, the State will pay Hydrite from the settlement sums Hydrite has paid the State, with interest—in effect returning to Hydrite the settlement payments Hydrite has made to the State. The precise issue, then, is whether Hydrite's costs in meeting its CAP obligations become "damages" solely because the State has added a nuisance claim to its claim to enforce Hydrite's CAP obligations, when Hydrite and the State have agreed that Hydrite's liability on the nuisance claim is limited to its CAP obligations.

¶ 25. We conclude that a reasonable insured in Hydrite's position would not expect that Hydrite's payments to the State would be covered as "damages." In substance, these payments are the costs of cleaning up the site that Hydrite is obligated by federal and state statute to incur. Had Hydrite fulfilled its obligations to clean up the site, the costs it incurred would not have been covered under its insurance policies, because, in the language of *Edgerton*, those costs would have been for the purpose of "remediation and cleanup of the affected site." *Edgerton*, 184 Wis. 2d at 785. Hydrite's payments to the State are no less for the purpose of "remediation and cleanup of the affected site" simply because the State denominates its claim as one for "nuisance," and the State and Hydrite call the payments "damages" for nuisance. If the distinction the court in *Edgerton* made—between cleanup costs as an equitable form of relief and substitutionary monetary compensation for past injury to property—is to be a meaningful one, then the former cannot be transformed into the latter solely because of the insured's course of action.

We are satisfied that a reasonable insured in Hydrite's position would not expect that to be the case.

¶ 26. We do not agree with Hydrite that *Hills* and *WPS* resolve the issue in this case. In neither of those cases was the insured ordered by the government to clean up the contaminated site; rather, the insured was sued by the entity that had been ordered to do so. Also, in neither case was the State suing the insured.

¶ 27. Hydrite relies on a statement in *Amcast Industrial Corp. v. Affiliated FM Insurance Co.*, 221 Wis. 2d 145, 584 N.W.2d 218 (Ct. App. 1998), in support of its distinction between the State as law enforcer and the State as property owner. In that case, the insured was ordered by DNR under Wis. Stat. § 144.76 (1993–94) (now Wis. Stat. § 292.11) to clean up a site where contamination had emanated from the insured's property and another site where the insured sent waste. *Amcast Indus. Corp.*, 221 Wis. 2d at 151–52. Relying on *Edgerton*, we concluded that these costs were not "damages" under the policy language. *Amcast Indus. Corp.*, 221 Wis. 2d at 161–62. Hydrite relies on the following footnote in *Amcast Industrial Corp.*:

> Amcast argues in passing that it is entitled to coverage because '[t]he government is the owner of the ground and surface water in Wisconsin.' Therefore, Amcast reasons, it is seeking coverage for cleanup costs sought by a *property owner*, which is similar to the *Hills* case. However, this argument is without merit because the DNR brought this action in its official capacity pursuant to sec. 144.76, Stats., 1993–94, and not as property owner.

*Id.* at 161 n.10. However, Hydrite omits the very next sentence: "Additionally, there is no third[-]party [ac-

tion] and no third-party claim." Hydrite also overlooks our citation to *WPS's* summary of *Hills*, with our added emphasis:

> In [*Hills*], this court held that *where parties other than the EPA or DNR seek recovery from an insurer* for damages its insured allegedly inflicted through contamination on property that does not fit within an owned-policy exclusion, the suit seeks "damages" under an insurance policy.

*Amcast Indus. Corp.*, 221 Wis. 2d at 160 n.9 (citing *WPS*, 209 Wis. 2d at 165). Rather than supporting Hydrite's position, *Amcast Industrial Corp.* indicates that we did not intend to include the EPA and DNR in our reference to third-party actions or claims.

¶ 28. In summary, we conclude that because the substance of the relief the State seeks in its action against Hydrite is to compel Hydrite to pay for the cleanup of the Cottage Grove site, it is not a suit for "damages" as used in the insurance policies, even though the State has labeled one of its claims "public nuisance." Therefore, there is no coverage under any of the insurance policies for any of the State's claims against Hydrite.

¶ 29. Because there is no coverage under any of the insurance policies, the only remaining issue is Hydrite's claim that the circuit court erred in concluding that Home did not have to reimburse Hydrite for its defense costs. The circuit court relied on *Mowry v. Badger State Mutual Casualty Co.*, 129 Wis. 2d 496, 385 N.W.2d 171 (1986), which holds that an insurer was not required to provide a free defense when the coverage trial preceded a trial on liability and damages. *Id.* at 528–29. The circuit court concluded that, since that is

what occurred in this case and since it decided the coverage issue in favor of Home, Home did not have an obligation to reimburse Hydrite for its defense costs.

¶ 30. Hydrite makes a very brief argument that in a letter dated January 17, 1996, Home agreed to "accept[] this tender of defense."[16] Home, in response, points out that the circuit court stated that Hydrite conceded that this letter gave Hydrite no greater right to recover defense costs than it had under Wisconsin law. Hydrite does not, in reply, explain whether it did or did not make such a concession, nor does it explain why Home was agreeing in the letter to do anything other than provide a defense as required under Wisconsin law. We treat Hydrite's failure to reply on this point as a concession. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994).

¶ 31. In reply to Home's argument that the circuit court correctly applied *Mowry*, Hydrite cites *Newhouse v. Citizens Security Mutual Insurance Co.*, 176 Wis. 2d 824, 501 N.W.2d 1 (1993), for the proposition that Home "must pay Hydrite's defense costs, at least through the date the coverage issues are finally decided," and provides no further argument. In a footnote, Hydrite states that the liability case was not completely stayed, because the stay order allowed settlement discussions between the State and Hydrite; Hydrite apparently seeks to have Home pay its attorney fees for those settlement discussions. However, *Newhouse* does not

---

[16] The January 17, 1996 letter from Home stated: "Home accepts this tender of defense under a full Reservation of Rights to deny all coverage to Hydrite for the State of Wisconsin claim." It then referenced its answer and affirmative responses for no coverage, which it filed in response to Hydrite's third-party complaint.

support such an outcome.[17] *Mowry*, as the circuit court correctly recognized, expressly holds that an insurer that has obtained a stay of the liability case pending resolution of coverage does not have an obligation to settle the liability case pending the coverage trial: "[t]he precise reason an insurer litigates a coverage issue is to release itself from any settlement and defense obligations." *Mowry*, 129 Wis. 2d at 523. Hydrite's brief, undeveloped argument lacking any supporting authority does not persuade us that Home has any obligation to pay Hydrite's attorney fees incurred in settling with the State. Accordingly, we affirm the circuit court's ruling on this point.

¶ 32. In conclusion, we affirm the summary judgment in favor of the insurers on grounds other than those relied on by the circuit court. We also affirm the order determining that Home is not obligated to pay Hydrite's defense costs.

*By the Court.*—Judgment and order affirmed.

---

[17] In *Newhouse*, after a ruling that there was no insurance coverage, the insurer rejected the circuit court's offer to stay the liability trial pending resolution of the appeal on the coverage issue. *Newhouse v. Citizens Sec. Mut. Ins. Co.*, 176 Wis. 2d 824, 832, 501 N.W.2d 1 (1993). The court of appeals determined that there was coverage. *Id.* In the insured's suit against the insurer alleging a breach of its duty to defend, the supreme court determined the insurer had breached that duty. *Id.* at 835–36. The supreme court rejected the insurer's argument that it could rely on the circuit court's favorable determination on coverage and did not have to seek a stay of the liability trial until the coverage issue was resolved by the appeal. *Id.* at 836.