STATE of Wisconsin, Plaintiff,

v.

HYDRITE CHEMICAL COMPANY a/k/a Avganic Industries, Inc., Defendant-Third-Party Plaintiff-Appellant-Cross-Respondent,

v.

TRAVELERS CASUALTY & SURETY COMPANY f/k/a Aetna Casualty & Surety Company, American Casualty Company of Reading, PA, Chicago Insurance Company, Continental Casualty Company, First State Insurance Company and First State Underwriters Agency of New England Reinsurance Corp. a/k/a New England Reinsurance Corp., Granite State Insurance Company, Great American Surplus Lines Ins. Co. a/k/a American Empire Surplus Lines Ins. Co., International Surplus Alliance Insurance Co. a/k/a International Insurance Co., Certain Underwriters at Lloyds of London a/k/a Certain London Insurers, Affiliated FM Insurance Company, Northbrook Excess & Surplus Insurance Company, as predecessor to Allstate Insurance Company, American Motorists Insurance Company, Home Indemnity Company and Home Insurance Company, Third-Party Defendants,

UNITED STATES FIRE INSURANCE Co., Third-Party Defendant-Respondent-Cross-Appellant,†

INTERSTATE FIRE AND CASUALTY COMPANY, Fourth-Party Plaintiff,

v.

MARYLAND CASUALTY COMPANY, Fourth-Party Defendant. [Case No. 00-3344.]

STATE of Wisconsin, Plaintiff,

v.

HYDRITE CHEMICAL COMPANY a/k/a Avganic Industries, Inc., Defendant-Third-Party Plaintiff-Appellant,

v.

TRAVELERS CASUALTY & SURETY COMPANY f/k/a Aetna Casualty & Surety Company, American Casualty Company of Reading, PA, Chicago Insurance Company, Continental Casualty Company, First State Insurance Company and First State Underwriters Agency of New England Reinsurance Corp. a/k/a New England Reinsurance Corp., Granite State Insurance Company, Great American Surplus Lines Ins. Co. a/k/a American Empire Surplus Lines Ins. Co., International Surplus Alliance Insurance Co. a/k/a International Insurance Co., Certain Underwriters at Lloyds of London A/K/A Certain

† Petition to review denied 6-1-2005.

London Insurers, Affiliated FM Insurance Company, Northbrook Excess & Surplus Insurance Company, as predecessor to Allstate Insurance Company, American Motorists Insurance Company, Home Indemnity Company and Home Insurance Company, Third-Party Defendants,

UNITED STATES FIRE INSURANCE Co., Third-Party Defendant-Respondent,

INTERSTATE FIRE AND CASUALTY COMPANY, Fourth-Party Plaintiff,

v.

MARYLAND CASUALTY COMPANY, Fourth-Party Defendant. [Case No. 01-0580.]

Court of Appeals

*Nos. 00–3344, 01–0580. Submitted on briefs October 20, 2004.— Decided March 17, 2005.*

2005 WI App 60

(Also reported in 695 N.W.2d 816.)

649

On behalf of the appellant-cross-respondent Hy-drite Chemical Co., the cause was submitted on the briefs of *Raymond R. Krueger* and *Cynthia E. Smith* of *Michael Best & Friedrich LLP* of Milwaukee.

On behalf of the respondents-cross-appellants American Motorist Ins. Co. and Northbrook Excess & Surplus Ins. Co., the cause was submitted on the brief

of *Robert Soderstrom* and *Michael W. Morrison* of *Tressler, Soderstrom, Maloney & Priess* of Chicago, Illinois.

On behalf of the respondents-cross-appellants Home Indemnity Co. and Home Ins. Co., the cause was submitted on the brief of *Alyssa M. Campbell* and *Mary A. Sliwinski* of *Williams Montgomery & John Ltd.* of Chicago, Illinois, and *Amy F. Scholl* of *Coyne, Niess, Schultz, Becker & Bauer* of Madison.

On behalf of the respondent-cross-appellant United States Fire Ins. Co., the cause was submitted on the brief of *Patrick J. Lubenow*, Milwaukee, and *Michael Resis* and *Timothy J. Fagen*, Chicago, all of *O'Hagen, Smith & Amundsen, LLC*.

A nonparty brief was filed by State of Wisconsin *Department of Justice* by *Peggy A. Lautenschlager*, attorney general, and *Philip Peterson*, assistant attorney general, in support of Hydrite Chemical Co.

Before Deininger, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. The primary issue on this appeal is whether the circuit court correctly determined that, based on the undisputed facts, the known loss doctrine precluded coverage for Hydrite Chemical Company under its excess liability policies for losses resulting from liability for groundwater contamination. We conclude that, when the insurance policy involved is an excess liability policy, the known loss doctrine bars coverage only when the insured knows there is a substantial probability that its liability to a third party will reach the excess layer.[1] Applying that standard, we

---

[1] We do not decide, however, whether an insured's knowledge is determined under a subjective or an objective standard. *See* footnote 19.

conclude there are genuine issues of material fact that entitle Hydrite to a trial on its third-party complaint against its insurer, United States Fire Insurance Company (U.S. Fire). We also conclude the circuit court correctly decided there are genuine issues of material fact on U.S. Fire's defense that Hydrite did not give timely notice as required by the policies. Thus, this is not an alternative basis on which to affirm summary judgment. Accordingly, we reverse the circuit court's order dismissing Hydrite's third-party complaint against U.S. Fire and remand for further proceedings.

## BACKGROUND

¶ 2. This action has a lengthy history, but we summarize only that relevant to this appeal. The State of Wisconsin sued Hydrite in 1995, alleging that there had been spills of hazardous substances at Hydrite's facility between 1978 and 1995 that had contaminated the soil and groundwater. The complaint alleged that Hydrite failed to take the actions necessary to restore the environment at its facility to the extent practicable and failed to minimize the harmful effects from the discharge in violation of Wis. Stat. § 144.76(3), now Wis. Stat. § 292.119(3).[2] Hydrite, in turn, filed third-party complaints against its insurers, including U.S. Fire, seeking a declaration that the insurers were obligated to defend and indemnify it and seeking damages for breach of contract. The issues of coverage and liability were bifurcated, and the insurers moved for summary judgment that there was no coverage on a number of grounds. The circuit court granted summary judgment in favor of some insurers, including U.S. Fire,

---

[2] This reference and all references to the Wisconsin Statutes from this point on are to the 2003–04 version unless otherwise noted.

on some of those grounds. Hydrite appealed, and U.S. Fire and other insurers cross-appealed.[3] At this point in time, the only insurer that remains a party to this appeal is U.S. Fire. The only issues we address are whether the undisputed facts entitle U.S. Fire to summary judgment under either the known loss doctrine or under the notice provision in its policies.

¶ 3. Much of the evidence relevant to this appeal is not disputed. Hydrite's facility is located in the Village of Cottage Grove, Wisconsin. Hydrite acquired the facility and surrounding land in 1970, when it purchased all the stock of North Central Chemicals, Inc. which had operated a business of repackaging bulk chemicals into smaller containers. At the time of the purchase, there were a large number of above-ground drums on the property, which North Central Chemicals had used to store used solvent chemicals. Between 1970

---

[3] In an earlier decision we addressed the issue raised by U.S. Fire's cross-appeal. We concluded that, under *City of Edgerton v. General Casualty Co. of Wisconsin*, 184 Wis. 2d 750, 517 N.W.2d 463 (1994), the relief the State sought against Hydrite in this action was not "damages" within the meaning of the policies, and we affirmed the summary judgment in favor of U.S. Fire on this ground. *State v. Hydrite Chem. Co.*, 2002 WI App 222, 257 Wis. 2d 554, 652 N.W.2d 828. Subsequently, the supreme court overruled *City of Edgerton* in *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257. The supreme court then granted Hydrite's petition for review of our decision and summarily vacated it, remanding to this court for further consideration in light of *Johnson Controls*. In U.S. Fire's supplemental briefing on the impact of *Johnson Controls*, it implicitly concedes that *Johnson Controls* requires vacation of our earlier decision, but, it asserts, there are other grounds on which to affirm the circuit court's grant of summary judgment in its favor—the known loss doctrine and the late notice.

and 1975, Hydrite did not have any business operations at the property and left the drums where they were.

¶ 4. In 1976, Hydrite began construction of a solvent reclamation plant on the property. To prepare the site for construction, Hydrite employees moved all of the drums to another part of its property. During the moving process, Hydrite employees became aware that the contents of some of the drums had leaked onto the ground beneath. As part of the 1976 construction project, Hydrite retained Warzyn Engineering Firm to conduct an investigation of the soil subsurface and provide recommendations for site preparation and foundation design. One of the seven soil borings taken was described as "strong odor noted," and this analysis was included in the report prepared for Hydrite.

¶ 5. In conjunction with later expansions of the plant, Warzyn conducted additional soil borings for Hydrite in November 1980 and June 1982. A "chemical odor" was noted in one of four borings in 1980 and in seven of eight borings in 1982. According to Hydrite's submissions, when it received the report of the June 1982 soil borings, it reviewed the 1976 report and that was when Hydrite first suspected a problem.

¶ 6. In October 1982, Hydrite contracted with Warzyn to make a preliminary assessment of the presence of solvents in the soil and groundwater within the boundaries of Hydrite's property. Hydrite received the report in December 1982 (1982 Warzyn report). Among the conclusions were:

> Volatile organics were observed in high concentrations in the groundwater monitoring wells, exceeding criteria levels established by the EPA at which human health effects are observed. Other compounds may exist which were not specifically detected by the analytical procedure used.

. . . .

> The potential migration of organic compounds off the Hydrite property can be affected by a variety of factors. We would anticipate that the organics will move off-site in the same direction as groundwater flow (south to south-east).

The report also concluded that the primary concern relating to human exposure was contamination of drinking water, but from recent samplings it did not appear the Village of Cottage Grove water supply system had been affected.

¶ 7. After receipt of the 1982 Warzyn report, Hydrite personnel contacted both the Department of Natural Resources (DNR) and the Environmental Protection Agency officials to tell them of the report and arranged for further investigation by Warzyn. The Warzyn project manager testified that in early 1983 he thought remedial action would likely be required, although the type of remedial action was not known, and he told this to Hydrite's vice president of technology.

¶ 8. In July 1983, Hydrite received the report of the second phase of the investigation (1983 Warzyn report), which found groundwater contamination at least 250 feet downgradient (east) of Hydrite's facility and also found that surface water, discharging to the marsh north of the site, indicated variable concentrations of chlorinated solvents. As to the extent of vertical migration of the contamination, the report stated:

> It is apparent that the contamination has penetrated deeper into the water table than originally indicated. It is expected that chlorinated solvents, which have a density greater than water, would tend to sink in the water table if present in excess of the solubility of water, particularly in the presence of vertically downward groundwater gradients.

¶ 9. Based on the results of the 1983 Warzyn report, Hydrite was aware that the remediation would be expensive and was concerned about the cost. After the DNR reviewed the report, DNR advised Hydrite by letter dated September 28, 1983, that Hydrite needed to develop a master plan that would address the different types of contamination found in the report and the corrective action for each. DNR observed that certain corrective action for the floating contaminants and the runoff contamination could and should occur immediately, but further investigation was needed to define the nature and extent of other sources of contamination before it could be known exactly what remedial action was required. Also in September 1983, Hydrite informed the village president it intended to begin a remedial program. By October 1983, Hydrite had announced its commitment for a cleanup of the site to local media.

¶ 10. Hydrite first applied for excess commercial umbrella insurance with U.S. Fire on November 1, 1983. The application contained this section: "Prior Experience: (Give complete details of each claim over $10,000.) Show total amounts for each loss, not just the amounts over $10,000. Include amounts paid and in reserve for each such loss." Hydrite did not refer to any investigation or remediation costs for groundwater contamination in the application. United States Fire issued a policy to Hydrite, effective January 1, 1984 to January 1, 1985, that provided $25,000,000 in excess of the primary commercial general liability (CGL) coverage, which was $1,000,000 per occurrence and $3,000,000 aggregate.

¶ 11. Hydrite submitted a second application to U.S. Fire in October 1984. This application requested that Hydrite "[l]ist all losses paid or now reserved in an

657

amount of $10,000 or more during the last five years." Hydrite did not list any investigation or remediation costs for groundwater contamination. United States Fire issued a policy effective January 1, 1985 to January 1, 1986, with the same coverage as that issued the preceding year.

¶ 12. Both policies provided that "[u]pon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company . . . ."[4]

¶ 13. In June 1988, Hydrite sank a deep well just south of its property and the test results revealed that there was undissolved liquid solvent below the bedrock at a depth of 170 feet below the ground surface. By 2000, over 100 wells had been installed on the site and on neighboring properties. Information gathered from monitoring the wells between 1995 and 2000 showed that contaminants had damaged groundwater to depths of over 200 feet in a contaminant plume about 3,000 feet across and about 1.5 miles long.

¶ 14. Meanwhile, Hydrite had applied in June 1983 for a permit under the Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k, to accept and store hazardous waste,

---

[4] Each policy also contained a Wisconsin endorsement providing that failure to give "such notice within such time shall not invalidate any claim made by the insured if it shall be shown to have not been reasonably possible to give notice within the prescribed time and that the notice was given as soon as reasonably possible." An occurrence was defined in both policies as "injurious exposure to conditions which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

and this permit was issued in June 1989. The permit required Hydrite to implement a corrective action plan to investigate and clean up the site, which was subsequently modified to incorporate corrective measures required under state law.[5]

¶ 15. Hydrite first submitted claims to U.S. Fire (and other insurers) in January 1991 for the "sums expended or to be expended for environmental investigation and clean-up in connection with [its] facility . . . ." In that communication, Hydrite stated it had spent $127,394 in investigation and clean-up from 1982 through 1985 and $1,711,599 from 1986 through 1990, increasing each year; and had budgeted approximately $6 million for clean-up between 1991 and 1995.

¶ 16. United States Fire moved for summary judgment on the ground that it had no obligation to provide Hydrite with coverage under either policy because, at the time Hydrite applied for the first policy, it knew there was groundwater contamination it was responsible for cleaning up. United States Fire relied on this court's statement in *City of Edgerton v. General Cas. Co. of Wisconsin*, 172 Wis. 2d 518, 561, 493 N.W.2d 768 (Ct. App. 1992) *aff'd in part, rev.'d in part by* 184 Wis. 2d 750, 517 N.W.2d 463 (1994), and *overruled by Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257, that "it is fundamental that an insurer does not insure a loss which has already occurred."[6] Hydrite responded that no Wisconsin court had applied the known loss doctrine

---

[5] In 1995, DNR became the lead agency responsible for supervising Hydrite's clean-up obligations, both federal and state, which is why it was the agency that initiated this lawsuit.

[6] After making this statement in *City of Edgerton v. General Cas. Co. of Wisconsin*, we did not consider how this principle applied in that case because we had already decided there were

659

and, moreover, it was undisputed that it did not know the extent of the damages that were the subject of this action until the 1990s.

¶ 17. The circuit court concluded that the known loss doctrine, expressed as the view that insurance does not insure a loss that has already occurred, was recognized in *City of Edgerton*, 172 Wis. 2d at 561. The court also concluded that, based on the undisputed facts, in the late summer of 1983 Hydrite knew that the groundwater in and around its facility was a moving aquifer and toxic chemicals from operations on its property had contaminated the groundwater beneath its property and nearby properties. While Hydrite did not know the extent of the contamination, the court stated, there was no dispute it knew that the contamination went beyond the limited area and depths that were specifically tested. Based on that knowledge, the court concluded, Hydrite expected the damages to the State, the owner of the groundwater, and it knew it was liable for the clean-up under state and federal law. Therefore, the court ruled, those damages were a known loss in 1983 and the policies issued by U.S. Fire for the calendar years 1984 and 1985 did not cover those damages.[7]

¶ 18. United States Fire also moved for summary judgment on the ground that Hydrite had not provided timely notice as required by the policy. United States Fire asserted that it knew well before 1991 that there was an occurrence "reasonably likely to involve the company." The court denied summary judgment on this ground. It stated that this policy language meant that

genuine issues of fact that required a trial. 172 Wis. 2d 518, 561, 493 N.W.2d 768 (Ct. App. 1992).

[7] The court concluded there were disputed issues of fact regarding whether the known loss doctrine applied to insurers who had issued policies to Hydrite in previous years.

Hydrite had to give notice when it was reasonable for it to conclude that the contamination it was aware of in 1982 and 1983 would result in damages that might reach beyond the limits of the underlying policies to U.S. Fire's excess policies. The court concluded there were disputed issues of fact as to when that occurred.[8]

## DISCUSSION

¶ 19.　In reviewing the grant or denial of a summary judgment, we apply the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). Summary judgment is proper if there are no genuine issues of material fact and one party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). In evaluating the evidence, we draw all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Grams v. Boss*, 97 Wis. 2d 332, 339, 294 N.W.2d 473 (1980). Whether an inference is reasonable and whether more than one reasonable inference may be drawn are questions of law. *Hennekens v. Hoerl*, 160 Wis. 2d 144, 162, 465 N.W.2d 812 (1991).

I. Known Loss Doctrine

A. Scope of Doctrine

¶ 20.　Although in the first round of briefing on this appeal the parties debated whether the known loss doctrine had been adopted in Wisconsin, that question

---

[8] The court also concluded that, even if the notice was untimely under the policy, there were disputed issues of fact as to whether U.S. Fire was prejudiced thereby. *See* WIS. STAT. § 631.81(1).

has been resolved by the recent supreme court decision in *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, 268 Wis. 2d 16, 673 N.W.2d 65. In that decision, the court described the doctrine as the principle that "insurers are not obligated to cover losses that are already occurring when the coverage is written or which have already occurred," and it applied this doctrine to bar coverage under certain policies in that case. *Id.*, ¶ 86. The dispute between Hydrite and U.S. Fire is now, in essence, over the scope of the doctrine— specifically, the nature and extent of the knowledge that an insured must have in order for the doctrine to bar coverage.

¶ 21. Hydrite contends that the known loss doctrine does not bar coverage unless the extent of the damage was substantially known by it before the beginning of the policy period. According to Hydrite, its submissions show that even after it received the 1983 Warzyn report, it believed the groundwater contamination was limited, and it was not until the mid 1990s that Hydrite "substantially knew the nature and massive extent of the contamination."[9] In a related argument,

---

[9] Hydrite points to language in our earlier decision on this appeal, *see* footnote 3, in support of its position that it did not know the extent of the contamination in 1983. In summarizing the background facts in that case, we stated:

> The exact causes and extent of the contamination are not relevant for purposes of the issues we decide, nor are the dates on which Hydrite learned of the causes and extent of the contamination. *It suffices to state there is no dispute that by July 1983, Hydrite had received a report indicating the presence of some groundwater contamination.*

*Hydrite*, 257 Wis. 2d 554, ¶ 3 (emphasis added). Hydrite relies on the second sentence, emphasizing the word "some," and suggests that this indicates this court's recognition that

Hydrite contends that it did not know in 1983, and had no reason to know, that the costs of investigation and remediation would be large enough to reach $1,000,000, the level at which U.S. Fire policies began to provide coverage.[10]

¶ 22. United States Fire responds that under *American Girl* the insured need not substantially know the costs of making repairs or the extent of its legal liability; it is sufficient if the damage is substantially known. According to U.S. Fire, it is undisputed that when Hydrite applied for insurance in November 1983,

---

Hydrite's knowledge was limited in 1983. That is a misreading of our decision. As we expressly state in the preceding sentence, it was not necessary for us to decide what Hydrite learned and when, and we did not examine or discuss the record on those points; instead, we related a few facts the parties agreed upon that were necessary as background to the issue we did decide —the meaning of "damages" in the insurance policies. We stated later in the decision that, because this issue was dispositive, we were not addressing the known loss doctrine or any other issue the parties raised on the appeal or cross-appeal. *Id.*, ¶ 13. Thus, nothing in that decision can be reasonably read as expressing a view on any of the questions that must be resolved in this decision.

[10] It is not clear whether Hydrite's position is that there are disputed issues of fact entitling it to a trial, or that it, rather than U.S. Fire, is entitled to summary judgment. In its brief in the trial court, Hydrite did not ask for summary judgment on the issue of the known loss doctrine, but instead asserted a trial was necessary. In its briefs on appeal, Hydrite at times argues there are factual disputes, and at other times argues there are none; and in its first appellate brief, it asks that we reverse and direct the circuit court to enter summary judgment in its favor. This lack of clarity does not affect our authority to examine both issues—whether there are genuine issues of material fact and, if there are none, which party is entitled to summary judgment—because both are questions of law.

it knew of off-site migration of solvent wastes into groundwater and wetlands from monitoring wells situated 250 feet off-site, knew its environmental consultant had found contaminants sinking at depth downgradient in a moving aquifer, had reported the contamination to federal, state, and local authorities, and had proposed remediation; also, Hydrite was aware of its liability under existing state and federal law and was already publicly committed to cleaning up the site.

■

¶ 23. We begin with some brief background on the known loss doctrine. This doctrine is a common law defense that exists independent of the particular terms of insurance policies.[11] 7 COUCH ON INSURANCE § 102:8; § 102:9 (3d ed. 2000). Sometimes the doctrine is described as being rooted in the policy of preventing fraud.[12] Sometimes it is described as based on the essential characteristic of insurance—that it insures risks, not certainties.[13] There are almost as many formulations of the doctrine as there are jurisdic-

---

[11] Besides the term "known loss," courts in other jurisdictions also use the terms "known risk" and "loss in progress," with some courts viewing these as distinct theories and others viewing them as the same. 7 COUCH ON INSURANCE § 102:8 (3d ed. 2000). It is unnecessary to explore the distinctions, if any, in this decision.

[12] *See, e.g., Inland Waters Pollution Control v. National Union Fire Ins. Co.*, 997 F.2d 172, 179 (6th Cir. 1993) (predicting Michigan law); *CPC Int'l, Inc. v. Hartford Accident & Idem. Co.*, 720 A.2d 408, 422 (N.J. Super. 1998); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 737 (Minn. 1997).

[13] *See, e.g., United States Liability Ins. Co. v. Selman*, 70 F.3d 684, 690 (1st Cir. 1995) (applying Massachusetts law); *SCA Servs., Inc. v. Transportation Ins. Co.*, 646 N.E.2d 394, 397 (Mass. 1995); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* 607 N.E.2d 1204, 1210 (Ill. 1992). This principle is also ex-

tions that have adopted it, with variations in: (1) how "loss" is defined, (2) the degree of certainty of the insured's knowledge that the loss has or will occur, and (3) whether the insured's knowledge is judged by a subjective or objective standard.[14] The known loss doctrine is distinct from the insurance contract term usually found in CGL policies defining an occurrence as

pressed in the statutes of several states. *See The Status of Certain Nonfortuity Defenses in Casualty Insurance Coverage*, 30 TORT & INS. L. J. 943, 986 (1995).

[14] At one end of the range, the narrow definition is that the doctrine does not bar coverage "as long as there remains uncertainty about damage or injury that may occur during the policy period and the imposition of *liability* upon the insured, and no legal obligation . . . has been established." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 906 (Cal. 1995). *See also CPC Int'l*, 720 A.2d at 422, and *Insurance Co. of North America v. Kayer-Roth Corp.*, 770 A.2d 403, 414–16 (R.I. 2001) (both following *Montrose*, 913 P.2d at 906); and *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215–16 (2d Cir. 1995) (known loss doctrine does not apply where, although the insured knew at the inception of its policies that its products risked asbestosis and cancer diseases and had received a large number of claims, it was highly uncertain . . . as to the prospective number of injuries, the number of claims, the likelihood of successful claims, and the amount of ultimate losses it would be called upon to pay). At the other end of the range, a broader definition is that the insured must know only of the contamination or property damage the insured is later held responsible for; that is defined "as the relevant loss, not the insured's legal liability arising therefrom." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F. Supp. 2d 771, 790 (E.D. Mich. 1998) (following *Inland Waters*, 997 F.2d at 179).

In between these are definitions that are hard to rank from narrow to broad because they vary on more than one parameter. As examples, the known loss doctrine applies if, at the time the policy was issued: (1) the insured was charged with knowledge that reasonably shows that it was, or should have been, aware

665

"unintended or unexpected from the standpoint of an insured." The doctrine focuses on the time the insurance contract is entered into, whereas the policy definition of occurrence focuses on the time of the act for which insurance is sought. *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215 (2d Cir. 1995); *General Housewares Corp. v. National Sur. Corp.*, 741 N.E.2d 408, 416 (Ind. App. 2000).[15]

of a likely exposure to losses that would reach the level of coverage, *Rohm & Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1177 (Pa. 2001); (2) the insured knows or has reason to know there is a substantial probability that loss or liability would ensue due to the contamination, *Outboard Marine Corp.*, 607 N.E.2d at 1212; (3) the insured knows there is a substantial probability that it will suffer or has already suffered a loss, *SCA Servs.*, 646 N.E.2d at 397–98; (4) the insured knew there was a substantial probability it would be sued for security violations, *Public Utility Dist. No. 1 v. International Ins. Co.*, 881 P.2d 1020, 1030–31 (Wash. 1994); and (5) the insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur, *General Housewares Corp. v. National Sur. Corp.*, 741 N.E.2d 408, 414 (Ind. App. 2000).

[15] The known loss doctrine and the definition of "occurrence" in policies are related in that they are both considered expressions of the principle of fortuitousness, which is implicit in the concept of insurance. *See* 7 COUCH ON INSURANCE § 102:9. In *Hedtke v. Sentry Insurance Co.*, 109 Wis. 2d 461, 483, 484, 326 N.W.2d 727 (1982), the court referred to the principle of fortuitousness to explain that insurance does not cover losses that are intentionally caused by the insured, regardless of the policy language. This court relied on the principle of fortuitousness in *Haessly v. Germantown Mutual Insurance Co.*, 213 Wis. 2d 108, 117, 569 N.W.2d 804 (Ct. App. 1997), to conclude that a homeowner's policy did not provide liability coverage for the insured's failure to provide aid to a person the insured had intentionally injured. Although the parties discussed these and related cases in their first round of briefing, we do not view them as useful in resolving the issues on this appeal.

¶ 24. Turning now to *American Girl*, we describe it in some detail, as the parties' positions are premised on their reading of this case. *American Girl* concerned CGL and excess policies issued to a general contractor that had contracted to design and build a large warehouse. The owner of the building eventually sued the contractor, alleging that the negligence of the soil engineer had caused excessive sinking of the building, resulting in damage to the building. 268 Wis. 2d 16, ¶ 17. After resolving disputes over coverage under other insurers' policies, the court addressed the known loss doctrine in relation to the CGL and excess policies issued for terms beginning April 1, 1997, and thereafter.[16] *Id.*, ¶ 85. The facts relevant to this issue were apparently not disputed and were set forth briefly by the court:

> The surcharging [process of compressing soil to make it dense enough to support the building's weight] was done according to [the soil engineer's] professional advice, and the building was substantially completed in August 1994. [The owner] took occupancy, and soon thereafter the [building] began to sink. By the spring of 1995 the settlement at one end of the structure had reached eight inches.

> [The contractor] became aware of the problem in March 1995, and [the soil engineer] was subsequently advised. In the fall of 1995 [the contractor] re-hung approximately 30 exterior panels and windows that

---

[16] The court concluded that under the "continuous trigger" theory there was coverage under the American Family CGL policies because the property damage to the building occurred continuously over a period extending from the later part of the 1994–95 policy term, throughout the 1995–96 policy term, and well into the 1996–97 policy term. *American Family Mut. Ins. Co v. American Girl, Inc.*, 2004 WI 2, ¶¶ 75–76, 268 Wis. 2d 16, 673 N.W.2d 65.

were leaking as a result of the settlement. The building continued to sink throughout 1996. By early 1997, the settlement approached one foot, the building was buckling, steel supports were deformed, the floor was cracking, and the sewer lines had shifted. In January or February 1997, the parties met to discuss the settlement damage and the options for remediation. In August 1997 [the contractor] notified its liability insurance carrier, American Family Insurance Company[, who had issued CGL and excess policies to the contractor from March 1993 to March 1997].

*Id.*, ¶¶ 13–14 (footnotes omitted).

¶ 25. The court stated its agreement with the circuit court's ruling that the known loss doctrine precluded coverage for the policies or other insurers issued for terms beginning April 1997 and thereafter, explaining:

> The known loss doctrine holds that insurers are not obligated to cover losses which are already occurring when the coverage is written or which has already occurred. *Estate of Logan v. Northwestern Nat'l*, 144 Wis. 2d 318, 348, 424 N.W.2d 179 (1988). Here, the fact that settlement was occurring on the 94DC was known as early as March of 1995, and the extent of the damage was substantially known by the time of the meeting in January or February, 1997. The policies of these remaining insurers post-date this period. Accordingly, the known loss doctrine precludes coverage under these policies.

*Id.*, ¶ 86. In a footnote, the court also stated its agreement with the circuit court's ruling that the January or February 1997 meeting "triggered the application of the known loss doctrine." *Id.*, ¶ 14 n.2.

¶ 26. While the court in *American Girl* did not directly define the scope of the known loss doctrine it was adopting, some definition is provided by the court's

ruling that the January/February 1997 meeting "triggered" the doctrine's application, *id.*, when that ruling is read in the context of the facts the court recited.[17]

¶ 27. First, it is evident from this ruling that the *American Girl* court did not consider the insured's knowledge that the settling was causing damage to the building sufficient to trigger the application of the known loss doctrine: the insured had that knowledge at least by the fall of 1995, when it made repairs to the

---

[17] The court's citation to *Estate of Logan v. Northwestern Nat'l*, 144 Wis. 2d 318, 348, 424 N.W.2d 179 (1988), does not aid in defining the scope of the doctrine. That case concerned the construction of specific language in a professional liability "claims made" policy. The policy covered claims first made during the policy period, even if the act or omission occurred before the policy period, provided that prior to the effective date of the policy, the insured "had no basis to believe that the insured had breached a professional duty or committed a personal injury." *Id.* at 330–31. After concluding that the insured knew at the time he applied for the insurance that he had breached a professional duty, *id.* at 339, the court rejected the argument that public policy and the reasonable expectations of the insured favored coverage:

> Under the terms of his policy, [the insured] could not reasonably have expected that Northwestern would pay any claims that arose as a result of that breach [of a professional duty, which he knew about]. *Insurers are not in the business of insuring known breaches, and any interpretation which required them to provide such coverage would be patently unreasonable.* The limitation imposed by Northwestern, as applied to its insured, is consistent with public policy and enforceable.

*Id.* at 348 (emphasis added). It is presumably the italicized sentence the *American Girl* court was citing to, but that statement was made in the context of construing a specific policy provision and does not appear to contemplate a common law doctrine existing independent of policy language.

building because of that damage.[18] We therefore understand that the court considered the January/February 1997 meeting to be the triggering event because at that time the insured's liability was discussed: the insured met with the owner to discuss "the settlement damage and the options for remediation." *Id.*, ¶ 14. This reading of *American Girl* is consistent with the view—apparently the majority view—that the relevant loss for purposes of applying the known loss doctrine to liability policies is not simply the property damage itself, but the insured's liability for the property damage. *See, e.g., Stonehenge Eng'g Corp. v. Employers Ins. of Wausau,* 201 F.3d 296, 302 (4th Cir. 2000) (predicting South Carolina law); *Pittson Co. Ultramar America Ltd. v. Allianz Ins. Co.,* 124 F.3d 508, 518–19 (3rd Cir. 1997) (predicting New Jersey law); *UTI Corp. v. Fireman's Fund Ins. Co.,* 896 F. Supp. 362, 376 (D.N.J. 1995) (predicting New Jersey law); *Rohm & Haas Co. v. Continental Cas. Co.,* 781 A.2d 1172, 1177 (Pa. 2001); *Montrose Chem. Corp. of California v. Admiral Ins. Co.,* 913 P.2d 878, 906 (Cal. 1995); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204, 1210 (Ill. 1992). *But see Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 10 F. Supp. 2d 771, 790 (E.D. Mich. 1998) (following *Inland*

---

[18] We recognize that, because the insurers in *American Girl* that were asserting the known loss doctrine issued policies that first provided coverage on April 1, 1997, it was not necessary for the court to decide at what precise point before that date the contractor had sufficient knowledge to trigger the doctrine. Thus, without footnote 2 cited above in paragraph 25, the case might reasonably be read as leaving unanswered the question whether the knowledge the contractor had in March 1995 was sufficient to trigger the loss. However, footnote 2 makes clear that the court decided that the knowledge the contractor had before the January/February 1997 meeting was not sufficient to trigger the application of the doctrine.

670

*Waters Pollution Control, Inc. v. National Union Fire Ins.*, 997 F.2d 172, 179 (6th Cir. 1993) (predicting Michigan law).

¶ 28. Second, there is nothing in the *American Girl* decision to indicate that, at the January/February 1997 meeting, the insured knew with certainty that it was going to be sued or was going to be held liable for the damages resulting from the sinking of the building. We therefore conclude that something less than certain knowledge about the insured's liability for damages to a third party is required. The formulation of "substantial probability," used in some jurisdictions, appears most consistent with the *American Girl* court's ruling for the triggering event. *See, e.g., SCA Servs. v. Transportation Ins. Co.*, 646 N.E.2d 394, 397–98 (Mass. 1995); *Outboard Marine*, 607 N.E.2d at 1210. Accordingly, we conclude that under *American Girl*, in order for the known loss doctrine to apply under a CGL policy, the insured must know more than the fact that there has been an occurrence that has caused damage to the property of a third party; the insured must also know that it is substantially probable that the insured will be liable for the damage.[19]

---

[19] As noted in paragraph 23 of this opinion, another issue involved in the application of the known loss doctrine is whether the knowledge of loss is judged by a subjective standard (what the insured actually knew) or an objective standard (what a reasonable insured would know in the circumstances, or what the insured knows or has reason to know). The court in *American Girl* refers to what the insured knew, thus suggesting a subjective standard. However, the issue of the proper standard was not addressed. In this case, the parties do not directly address the issue. Both parties refer to what "Hydrite knew," but Hydrite also at times uses the phrase "reasonable insured." There are cases supporting each standard. Generally, courts

¶ 29. Third, it is evident from the *American Girl* decision that, at the time of the meeting in January/February 1997, only a small portion of the cost of remediation was known. After the insured contacted American Family in August 1997, that insurer initially reserved $750,000 for the claim, but by early 1999 remediation alternatives were estimated to cost between $4.1 and $5.9 million. *American Girl*, 268 Wis. 2d 16, ¶ 14. Further, it was not learned until later in 1999 that the building was no longer safe and had to be dismantled. *Id.*, ¶ 16. We therefore understand that the court in *American Girl* did not require the insured to know the extent of its liability in order for the know loss doctrine to apply. We recognize that this reading is difficult to harmonize with the court's later statement that "the extent of the damage was substantially known

that adopt the subjective standard view it as appropriate to the fraud prevention policy underlying the doctrine. *See, e.g., City of Sterling Heights v. United Nat'l Ins. Co.*, No. 03–72773, 2004 WL 252091, at *10 (E.D. Mich. Feb. 11, 2004); *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F. Supp. 2d 771, 789–91 (E.D. Mich. 1998); *United Techs. Corp. v. American Home Assur. Co.*, 989 F. Supp. 128, 151 (D. Conn. 1997); *Domtar*, 563 N.W.2d at 737 (Minn. 1997). Those courts that adopt an objective standard presumably do so because insurance policy terms are generally construed according to the expectations of a reasonable insured; but we have not located a case that explains its reasoning on this point. *See, e.g., Rohm & Haas*, 781 A.2d at 1177 (insured was or should have been aware); *Outboard Marine*, 607 N.E.2d at 1210–11 (knows or has reason to know).

It is unnecessary to resolve this issue on this appeal because the factual disputes we discuss in paragraph 37 exist under either a subjective or objective standard. In the proceedings on remand, the circuit court may address this issue if either party raises it. In this opinion, we refer to what "Hydrite knew," without deciding whether a subjective or an objective standard is correct.

by the time of the meeting in January or February, 1997." *Id.*, ¶ 86. Viewed in isolation, this phrase might mean, as Hydrite argues, that the known loss doctrine does not apply unless the insured knew to a substantial extent the amount of the damages it would be liable for. However, this meaning is inconsistent with the facts of the case as the court described them. We conclude the better reading of *American Girl* is that it does not require that the insured know the extent of its liability in order for the known loss doctrine to apply.

¶ 30. However, *American Girl* does not address Hydrite's argument that, when *excess* polices are involved, the insured must know there is a substantial probability that the damages for which the insured will be liable will reach the excess layer. It is true the court in *American Girl* applies the known loss doctrine to bar coverage under both the underlying CGL policies and the excess policies, but the issue of whether there is a distinction between the two for purposes of applying the doctrine was not addressed. That is the issue we turn to now and, because there is no Wisconsin law on point, we look to cases from other jurisdictions.

¶ 31. We have located only two cases that directly discuss the significance of excess policies in applying the known loss doctrine: *UTI*, 896 F. Supp. at 376–78, and *Gould, Inc. v. Arkwright Mut. Ins. Co.*, 907 F. Supp. 103, 109 (M.D. Pa. 1995). In *UTI*, the court rejected the excess insurer's argument that it was entitled to summary judgment because the insured knew on the date the policy issued of the leakage of pollutants on its site and the possible contamination of the neighbor's well. 896 F. Supp. at 377. The court reasoned that the relevant loss under a third-party liability insurance policy is the loss for which the insured is legally liable, and there was no evidence that the insured knew that

673

its liability would reach the excess layer. *Id.* The court in *Gould* found the rationale in *UTI* persuasive and concluded that, in order for the known loss doctrine to apply to an excess policy, "there must be evidence that there existed certain knowledge of a particular legal liability which would reach the excess layer." 907 F. Supp. at 109.

¶ 32. In a third case, *Rohm & Haas*, 781 A.2d at 1177, the court approved this standard: " 'whether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should [have been] aware of a likely exposure to losses which would reach the level of coverage.' " However the court did not discuss the rationale for modifying "losses" to those "which would reach the level of coverage."

¶ 33. We recognize that in jurisdictions that define the relevant loss as the damage to the third party's property rather than the liability that arises from that damage, it appears logically irrelevant whether the policy involved is a primary or an excess policy. *See, e.g., Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F. Supp. 2d 771, 790 (E.D. Mich. 1998) (following *Inland Waters*, 997 F.2d at 179). However, as we have already stated, the court in *American Girl* implicitly decided the relevant loss for purposes of liability policies is not simply the damage to the property of a third party but the legal liability for that damage. Under this view of the relevant loss, it does make a difference whether the policy is primary or excess: there is a loss under the primary policy if the insured is liable in any amount, but there is a loss under the excess policy only if the damages for which the insured is liable reach the excess layer.

¶ 34. In order to determine whether we should follow the analysis in *UTI* and *Gould* regarding excess policies, we examine the issue in light of the public

policies underlying the known loss doctrine. The public policy against fraud focuses on preventing insureds from benefiting when they wrongfully withhold material information from the insurer in order to obtain insurance. *See, e.g., Domtar Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 737 (Minn. 1997). However, if an insured does not know there is a substantial probability that the insured's liability will reach the excess layer, the policy against fraud is not served by precluding coverage in that instance. As for the public policy that insurance should cover risks, not certainties, if there is not a substantial probability that an insured's liability will reach the excess layer, then it is not a certainty— and not close to a certainty—that it will. Thus, we do not see why public policy should prevent the insured from obtaining excess insurance in that situation.

¶ 35. United States Fire argues that the known loss doctrine should apply because Hydrite wrongfully withheld information on the application form by not listing the amount it had already spent on the investigative reports (more than $15,000 as of November 1983 and more than $29,000 as of November 1984) or the amounts reserved for further investigation and remediation. However, the record does not show it is undisputed that Hydrite understood or should have understood that U.S. Fire intended that it list the cost of those investigations; and U.S. Fire points to no evidence that Hydrite had any reserves related to the contamination when it applied for the excess insurance. Most importantly, however, U.S. Fire does not argue that Hydrite made a misrepresentation on the application form that, in itself, provides a basis for rescission or otherwise affects its obligations. *See* Wis. Stat. § 631.11(1)(b).[20]

---

[20] Wisconsin Stat. § 631.11(1)(a)-(b) provides:

¶ 36. We conclude that, in order for the known loss doctrine to bar coverage under an excess policy, the insured must know when it obtains the insurance that there is a substantial probability that it is liable for damage to the property of a third party in an amount that will reach the excess layer.

## B. Application of Doctrine

¶ 37. Applying the doctrine as we have defined it to the record in this case, we first conclude it is undisputed that Hydrite knew when it applied for the

---

(1) EFFECT OF NEGOTIATIONS FOR CONTRACT. (a) *Statement or warranty.* No statement, representation or warranty made by a person other than the insurer or an agent of the insurer in the negotiation for an insurance contract affects the insurer's obligations under the policy unless it is stated in any of the following:

1. The policy.

2. A written application signed by the person, provided that a copy of the written application is made a part of the policy by attachment or endorsement.

3. A written communication provided by the insurer to the insured within 60 days after the effective date of the policy.

(b) *Misrepresentation or breach of affirmative warranty.* No misrepresentation, and no breach of an affirmative warranty, that is made by a person other than the insurer or an agent of the insurer in the negotiation for or procurement of an insurance contract constitutes grounds for rescission of, or affects the insurer's obligations under, the policy unless, if a misrepresentation, the person knew or should have known that the representation was false, and unless any of the following applies:

1. The insurer relies on the misrepresentation or affirmative warranty and the misrepresentation or affirmative warranty is either material or made with intent to deceive.

2. The fact misrepresented or falsely warranted contributes to the loss.

676

U.S. Fire excess policies that it was liable for the costs of further investigating and remediating the contamination. As the circuit court concluded—and Hydrite does not deny—there is no genuine issue of material fact that Hydrite knew it was responsible under state and federal law for remediating the contamination to the groundwater that originated from contaminants on its property.

¶ 38. However, we also conclude there are genuine issues of material fact regarding whether Hydrite knew in November 1983 and November 1984 that there was a substantial probability its liability would reach $1,000,000—the amount at which U.S. Fire's policies would begin to provide coverage. On this point, our analysis follows the circuit court's analysis on the notice issue. The July 1983 Warzyn report indicates the extent of the contamination was unknown. Based on that, on the September 1983 DNR letter laying out what Hydrite needed to do, and on the evidence that Hydrite spent $127,394 from 1982 through 1985, one can reasonably infer that Hydrite knew when it applied for the U.S. Fire policies that there was a substantial probability the amount of its liability would reach $1,000,000 at some point. On the other hand, there is also evidence from which one can reasonably infer that Hydrite did not have this knowledge until later: the discovery of the greater depth of the liquid solvent was not until 1988; a September 1987 internal memorandum described the costs as uncertain but "significant . . . possibly in the range of $100,000 to $200,000 per year" in the first several years and then $50,000 to $100,000 per year for as much as 10 years"; and actual expenditures did not approach $1,000,000 until later in the 1980s. Accordingly, we conclude that U.S. Fire was not entitled

to summary judgment based on the known loss doctrine, and Hydrite is entitled to a trial on this issue.

II. Notice to U.S. Fire

¶ 39. United States Fire contends that, even if we conclude the circuit court erroneously granted summary judgment on the known loss doctrine, we can affirm based on its defense that Hydrite did not provide timely notice as required by the policies. For the reasons stated in the preceding paragraph, we disagree. Hydrite was obligated under the policy to give notice "as soon as practicable" upon "the happening of an occurrence reasonably likely to involve the company." For purposes of this appeal, Hydrite's obligation to give notice depends upon an analysis of the same evidence relevant to application of the known loss doctrine. As the circuit court correctly recognized, the evidence gives rise to competing reasonable inferences as to when Hydrite knew its liability for investigation and remediation would be "reasonably likely" to reach a level that would involve U.S. Fire.

## CONCLUSION

¶ 40. We conclude there are disputed issues of fact that entitle Hydrite to a trial on U.S. Fire's defenses of known loss and late notice. We therefore reverse the summary judgment dismissing Hydrite's third-party complaint against U.S. Fire and remand for further proceedings.

*By the Court.*—Judgment reversed and cause remanded.

¶ 41. VERGERONT, J. (*concurring*). I write separately to raise a question not answered by *American*

*Girl*: is there a need in Wisconsin for the known loss doctrine that is not adequately addressed by the combination of insurance contract terms, questions on the application for insurance, and the defenses available to insurers under WIS. STAT. § 631.11. *See* footnote 20.

¶ 42. Insurers may exclude from coverage losses about which insureds knew when they applied for insurance. *See, e.g., National Union Fire Ins. Co. v. Stroh Cos., Inc.*, 265 F.3d 97, 104 (2d Cir. 2001) (contaminated products insurance policy excluded losses that, as of the inception of the policy, "the insured knew or could have reasonably been expected to know . . . had occurred or might likely occur"). Insurers may also ask insureds to identify on applications all losses (defined by the insurers) that insureds know have occurred or will likely occur, and insurers may then exclude these losses from coverage. If an insured makes a representation the insured knows or should have known was false, and the other requirements of WIS. STAT. § 631.11 are met, that is a basis for rescinding the policy or limiting the insurer's obligation under the policy. Although many jurisdictions have adopted the known loss doctrine, in none of the cases I read did I find an explanation of the need for the doctrine in view of these and comparable alternatives.

¶ 43. On the other hand, I did find cases—though, to be sure, in a minority of jurisdictions—that either declined to adopt the known loss doctrine or expressed reservations about it for reasons that are worth considering. *See City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1153 (2d Cir. 1989) (refusing to adopt the known risk defense in the absence of New York law on point, and expressing concern that the defense "might well swallow up the 'more narrow' doctrines regarding (1) concealment and misrepresen-

tation, and (2) damages that are 'expected' or 'intended' by the insured"); *Generali-U.S. Branch v. Bank of Montreal*, No. 92–36689, 1995 WL 21595, at *1 (9th Cir. 1995) (predicting Oregon would be persuaded by *Johnstown* and not apply known risk/known loss doctrine); *Aluminum Co. of America v. Aetna Cas. & Sur. Co.*, 998 P.2d 856, 879 n.15, 882 (Wash. 2000) (expressing discomfort in applying an exclusion that is not stated in the contract, but nonetheless following the governing law of Pennsylvania); *Owens-Corning Fiberglas Corp. v. American Centennial Ins. Co.*, 660 N.E.2d 770, 778 (Ohio Com.Pl. 1995) (declining to adopt doctrine in part because it would swallow up the narrow doctrines regarding fraud and misrepresentation and the policy term that an occurrence must be neither expected nor intended by the insured).

¶ 44. If the known loss doctrine is needed to effectuate public policies that are not already adequately addressed, then an articulation of that need will provide a foundation for defining the scope of the doctrine. This is a topic that has a significant impact on insureds and insurers alike and, in my view, is deserving of further consideration by the supreme court.

¶ 45. I am authorized to state that Judge Lundsten joins this concurrence.